SZABO FOOD SERVICE, INC., OF NORTH CAROLINA v. BALEN-
TINE'S, INC., DEFENDANT AND WAKE COUNTY, ADDITIONAL DE-
FENDANT

No. 28

(Filed 1 July 1974)

1. **Chattel Mortgages and Conditional Sales § 1— conditional sale or lease
— character of agreement as determinant**

In determining whether a contract is one of bailment for use, a
lease with an option to purchase, or one of sale with an attempt to
retain a lien for the purchase price, the courts do not consider what
description the parties have given to it, but what is its essential char-
acter.

2. **Chattel Mortgages and Conditional Sales § 1— character of agreement
determined by intent of parties**

Whether an agreement constitutes a conditional sale or a contract
of a different character is a question of the parties' intent as shown
by the language they employed.

3. **Chattel Mortgages and Conditional Sales § 1— conditional sale or lease
— obligation to pay purchase price**

One of the principal tests for determining whether a contract is
one of conditional sale or lease is whether the party is obligated at
all events to pay the total purchase price of the property which is the
subject of the contract.

4. **Chattel Mortgages and Conditional Sales § 1; Landlord and Tenant § 5;
Taxation § 25— cafeteria equipment — transfer at end of lease — no
conditional sale — responsibility for ad valorem taxes**

An agreement entered into by the parties whereby defendant was
to take over the operation of a cafeteria for the duration of plaintiff's
lease with a third person was a lease and not a conditional sales con-
tract, though plaintiff agreed to transfer equipment without further
charge to defendant if defendant should operate the cafeteria until
the end of the seven year lease, since plaintiff's main purpose in enter-
ing into the contract was to have defendant rescue it from a failing
business venture by taking over operation of the cafeteria, the trans-
fer of the equipment was regarded by both parties as merely a fringe
benefit to defendant, defendant was under no obligation to buy the
equipment, no purchase price was specified and no value was placed
on the equipment; therefore, plaintiff held title to the equipment and
was required to list it for taxes.

5. **Uniform Commercial Code § 71— cafeteria equipment — no conditional
sale**

Though an agreement between the parties provided that defendant
would become the owner of equipment at the end of the term of the
agreement without paying any additional consideration, G.S. 25-1-201
(37) was not applicable to make the agreement a conditional sales
contract, since that statute did not fit the facts of the case, nor was

it consistent with the fundamental proposition that to create a security interest the parties must have intended to create one.

ON *certiorari* to review the decision of the Court of Appeals reversing the judgment of *Hobgood, J.,* 19 March 1973 Session of the Superior Court of WAKE.

By this action for a declaratory judgment, brought under G.S. 1-253 *et seq.,* plaintiff (Szabo) seeks to determine whether it or defendant (Balentine's) is responsible for listing and paying the taxes for the years 1970, 1971, and 1972 on certain tangible personal property used in the operation of Balentine's Cafeteria at 410 Oberlin Road in Raleigh, Wake County, North Carolina. Wake County was joined with Balentine's as a party defendant because its tax supervisor and tax collector are charged with the duty of listing and collecting the taxes in question.

The following facts are established by the pleadings, stipulations, and unquestioned documentary evidence:

In 1966 Balentine's sold Balentine's Cafeteria, including the equipment, which is the subject of this action, to Szabo. Thereafter Szabo changed the name to Longworth's Cafeteria but continued to operate the business at the same location under a sublease of the premises from J. W. York (York) for a term ending 31 December 1976. For the years 1967, 1968, and 1969 Szabo listed and paid the taxes on the property.

On 14 August 1969 Szabo, desiring to terminate its operation of the cafeteria, entered into a written agreement with Balentine's whereby Balentine's took over the operation of the business with York's consent. In pertinent part, the terms of this agreement (hereinafter referred to as "the contract") are summarized below (enumeration ours).

## AGREEMENT OF SZABO

Szabo "set over and assigned" to Balentine's its right to occupy the premises (410 Oberlin Road) and every other right granted to Szabo in the sublease between it and York. In addition Szabo agreed:

(1) To make all payments required by its lease from York except the cost of insurance, maintenance and repairs to the premises.

(2) That "Balentine's shall have the use of all existing equipment located in the demised premises" so long as Balentine's occupies the premises under the agreement and, if this agreement is not terminated prior to the expiration of Szabo's lease from York, Szabo will "transfer said equipment without further charge to Balentine's at the termination of the sublease with J. W. York."

(3) To pay the cost of new leasehold improvements and equipment installed in the premises under Balentine's direction in an amount not to exceed $50,000 and to lend Balentine's, without interest, any difference between $50,000 and the initial cost of such new equipment, any unpaid balance due on this loan to become due and payable at the termination of Balentine's occupancy of the premises under this agreement.

(4) To "pay all sales, income, ad valorem and other taxes now accrued on its operation in the demised premises and to hold Balentine's harmless from any claim or demand based thereon."

### Agreement of Balentine's

Balentine's agreed:

(1) To operate a cafeteria or restaurant in the premises which Szabo had leased from York "for a minimum of two years from the date on which such cafeteria opens for business under Balentine's direction and control."

(2) To pay Szabo on or before the 10th day of each month following the month on which Balentine's opens for business, up to and including the 10th day of January 1977, a sum equal to 10% of the gross amount (less sales tax) of retail sales realized from the premises during the preceding calendar month or part thereof. If Balentine's, at its option, fails to operate a cafeteria or restaurant in the demised premises for a period of two years after it initially opens for business, it will nevertheless pay monthly rent for the two-year period in an amount equal to 10% of the average monthly gross receipts for the then past six months or for the average monthly gross receipts for the period of operation if the period of operation has been less than six months.

(3) That, "if for any reason, at its option, Balentine's shall fail to operate a cafeteria or restaurant in the demised premises for the full term remaining under the lease from J. W. York to

---

---

Szabo," Balentine's will return to Szabo "all of the equipment delivered to it and contained in the demised premises and all additions made thereto in the operation of said cafeteria . . . intact, in operating condition, and connected for operation, reasonable wear and tear and . . . casualty excepted."

(4) To keep all equipment contained on the premises fully insured and, in the event of loss, to use the proceeds of such insurance to replace any damaged property.

For the year 1970 Szabo listed and paid the taxes on the equipment used in the operation of the cafeteria. This listing, introduced in evidence by Balentine's, purports to be "a full, true, and complete listing of all property which it is the duty of Szabo to list as owner . . . in Raleigh township, Wake County, North Carolina." Thereafter, however, asserting that the property had been improperly listed and paid, Szabo demanded a refund. Subsequently, in the years 1971 and 1972, the tax supervisor forwarded to Szabo a proper tax abstract, but each year Szabo refused to list the property upon the ground that Balentine's was responsible for the taxes. Balentine's has refused to list the property for taxes on the ground that Szabo owns it.

Upon the trial before Judge Hobgood, Szabo introduced the stipulations, the contract, and the lease-agreement between Szabo and York. Balentine's introduced the tax abstract, which Szabo filed with the tax supervisor when it listed the property for taxes for 1970, a letter from R. A. Longworth, president of Szabo, to W. W. Balentine, president of Balentine's, and offered the testimony of W. W. Balentine. Mr. Balentine's testimony, summarized except when quoted, tended to show:

In 1966 Balentine's sold its profitable restaurant and cafeteria business to Szabo. In 1969, Mr. Longworth, president of Szabo, came to Balentine "with an offer to please come back and take over this operation. They talked like they wanted [him] to take it over pretty bad. . . . The deal was that [Balentine's] would come back in and take over and run out [Szabo's] lease and would pay [Szabo] 10% for their interest and they would pay Willie York out of the 10%." The written agreement was that Balentine's would be there for two years but at any time after that it was free to go. However, if it stayed there until the end of the Szabo lease with York, the equipment would automatically be Balentine's property on 1 January 1977, and it would then be in position to continue the business without inter-

ruption if it wanted to do so. If it discontinued its operation of the cafeteria before the expiration of Szabo's lease, all equipment would be returned to Szabo, including any new equipment which replaced original equipment. The agreement to transfer the equipment to Balentine's at the end of the lease was because the equipment would be 13 years old on 20 March 1973. "Restaurant equipment is basically figured for ten years. The government will let you depreciate it over ten years. What the equipment will be worth to [Balentine's] on the first day of 1977 won't be much. . . . " Szabo started depreciating the property in 1966 and 10 years would run out at the end of its lease.

The cafeteria equipment has never been carried on Balentine's books as an asset of the corporation, and it has never taken any depreciation or amortization on the property. In the discussions preceding the agreement between Szabo and Balentine's of 14 August 1969, "Mr. Longworth said that the depreciation [on this property] meant a lot to them and is how they could go ahead and lease me and put this fifty thousand dollars which they would add to their depreciation."

During most of the months of August and September 1969 the cafeteria was closed for the purpose "of tearing down what they had done to [Balentine's] profitable place." That is what the $50,000 was used for.

In a letter which Longworth wrote Balentine on 21 July 1969 he set out the essentials of the agreement which he and Balentine had agreed to sign. In Item 3 of the letter he said: "You will receive title to the equipment after we have fully depreciated it at our existing rates."

No additional evidence was offered.

In his judgment Judge Hobgood found facts consistent with the above statement. *Inter alia,* he found that the cafeteria equipment in question had a useful life for tax-depreciation purposes of 10 years and at the termination of Szabo's lease with York on 31 December 1976 the equipment will have been fully depreciated; that Szabo retained title to the equipment for the purpose of depreciating it and voluntarily listed it for taxes with the Wake County Tax Supervisor for the year 1970 and paid the taxes on it. As a matter of law he concluded: (1) Szabo is the owner of the cafeteria equipment; (2) the contract is a sublease of the cafeteria premises and equipment and not a chattel mortgage, conditional sale, or security agreement; (3)

as owner Szabo is required by G.S. 105-304 to list the property for taxation for the years 1970 and 1971, and is required by G.S. 105-306 to list the property for 1972 and subsequent years.

From the judgment that Szabo list and pay the taxes for the years 1971, 1972, 1973, and each year subsequent thereto during which plaintiff shall own the property on the first day of January, Szabo appealed. The Court of Appeals reversed Judge Hobgood's decision upon the following rationale: (1) Under Section 1-201(37) of the Uniform Commercial Code, G.S. 25-1-201(37) the contract was "one intended for security" and is, therefore, a conditional sale of the cafeteria equipment. (2) Under both G.S. 105-304(a) (1958) and G.S. 105-306(c)(2) (1972) the vendee in possession of personal property under a conditional sales contract is required to list it for taxes. *Food Service Inc. v. Balentine's*, 19 N.C. App. 654, 199 S.E. 2d 736 (1973). Upon defendant's petition we allowed certiorari.

*Bailey, Dixon, Wooten, McDonald & Fountain for plaintiff appellee.*

*Purrington, Hatch & Purrington and J. B. Bilisoly, Wake County Tax Attorney for defendant appellants.*

SHARP, Justice.

Prior to 1971 G.S. 105-304, enacted as Section 802, Chapter 291, N. C. Sess. Laws of 1937, required the owner of personal property to list it for taxation but provided that the owner of the equity of redemption in property subject to a chattel mortgage and the vendee of personal property under a conditional sale, or any other sale contract through which title is retained by the vendor as security for the payment of the purchase price, should be considered the owner of the property if he had possession of the property or the right to use it. Since 1971 the listing of personal property for taxation has been governed by G.S. 105-306, which does not differ materially from G.S. 105-304, summarized above.

The sole question presented by this appeal is whether the contract between Szabo and Balentine's, dated 14 August 1969, is a lease or a conditional sale of the cafeteria equipment described therein. If the agreement constituted a lease Szabo holds the legal title as owner, and Judge Hobgood's decision was correct; if the contract was a conditional sale, title remaining in Szabo "as security for the payment of the purchase price. . . , "

then Balentine's is a conditional vendee in possession and the decision of the Court of Appeals must be affirmed.

At the outset we note that the purpose of this action is to determine which of two parties to a purported lease agreement is required by the taxing statute to list the equipment in the demised premises for taxation. This is not a suit brought by a lessor-creditor under the provisions of the Uniform Commercial Code (G.S. 25-1-101 *et seq.)* (the Code) to enforce against its lessee-debtor, or one claiming through him, a security interest in property which the debtor holds under an alleged security agreement. On this record Balentine's has performed its obligations under the contract and is not in default. Szabo seeks to have the equipment it purportedly leased to Balentine's declared subject to a "security interest" and the contract declared a "security agreement" under the Code upon the theory that G.S. 25-1-201(37) makes the lease "one intended for security," because Balentine's will become the owner of the property for no additional consideration if it operates the cafeteria until the end of Szabo's lease on 31 December 1976. From this premise it argues (and the Court of Appeals held) that if the equipment is subject to a security interest the contract is, in effect, a conditional sales agreement and, as the vendee in possession, Balentine's has the duty to list and pay the taxes in controversy.

Balentine's contends that the Code is irrelevant to this controversy because (1) the contract shows on its face that the parties did not intend to create a security interest in the property and therefore none could result; (2) even if it be held that G.S. 25-1-201(37) made the lease one for security the decisive question remains one of title; (3) the Code does not attempt to determine whether title to property subject to a security interest is in the secured party or the debtor; and (4) their rights under the Code are without reference to title which will be decided by well established rules for determining whether an agreement is a lease or a conditional sale.

The parties' contentions make it necessary to examine the character of a conditional sale and the provisions of the Code with reference to security transactions.

Part 2 of Article 1 of the Uniform Commercial Code is entitled "General Definitions and Principles of Interpretation." In pertinent part G.S. 25-1-201 (the first section of Part 2) provides, "Subject to additional definitions contained in the

subsequent articles of this chapter which are applicable to specific articles or parts thereof, and unless the context otherwise requires, in this chapter:

. . .

"(3) 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances. . . .

. . .

"(37) 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. . . . Unless a lease . . . is intended as security, reservation of title thereunder is not a 'security interest.' . . . Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security." Here we note the official comment that the last two sentences in Code section 1-201(37) "give guidance on the question whether reservation of title under a particular lease of personal property is or is not a security interest."

G.S. 25-9-102 defines the "Policy and scope" of Article 9, which specifically governs "Secured Transactions." Subsection (a) declares Article 9 applicable "to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures" within the jurisdiction of the State. Subsection (c) of G.S. 25-9-105 defines "collateral" as "property subject to a security interest, and includes accounts, contract rights and chattel papers which have been sold." Subsection (h) defines "security agreement" as "an agreement which creates or provides for a security interest." In the Official Comment to section (a) of G.S. 25-9-102 it is said, "Except for sales of accounts, contract rights and chattel paper [the subject of section (b)] the principal test whether a transaction comes under this Article is: Is the transaction intended to have effect as security? . . . Transactions in the form of consignments or leases are subject to this Article if the understanding of the parties or the effect of the arrangement shows that a security interest was intended. . . . When it is found that a security interest as defined in Section 1-201(37) was intended, this Article

applies regardless of the form of the transaction or the name by which the parties may have christened it."

G.S. 25-9-202 makes the title to collateral immaterial by providing, "Each provision of this article [9] with regards to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor."

In the Official Comment to Article 9 it is said:

"This article does not determine whether 'title' to collateral is in the secured party or in the debtor and adopts neither a 'title theory' nor a 'lien theory' of security interests. Rights, obligations and remedies under the Article do not depend on the location of title (Section 9-202). The location of title may become important for other purposes—as, for example, in determining the incidence of taxation—and in such a case the parties are left free to contract as they will. In this connection the use of a form which has traditionally been regarded as determinative of title *(e.g.,* the conditional sale) could reasonably be regarded as evidencing the parties' intention with reference to the collateral." Uniform Commercial Code § 9-101, Comment.

The Official Comment, Uniform Commercial Code § 9-202, reiterates that "the incidents of a security interest which secures the purchase price of goods are the same under this Article whether the secured party appears to have retained title or the debtor appears to have obtained title and then conveyed it or a lien to the secured party. . . . Thus if a revenue law imposes a tax on the 'legal' owner of goods . . . this Article does not attempt to define whether the secured party is a 'legal' owner or whether the transaction 'gives' a security interest for the purpose of such laws. Other rules of law or the agreement of the parties determine the location of 'title' for such purposes."

The North Carolina Comment to G.S. 25-9-202 includes the following: " . . . [T]he Official Comment states that this section does not mean that title will never be significant. For tax, or other purposes it may be necessary to determine the location of title, and the Code takes no position on the theory used for such purposes. . . . In such a case under the Code, the court would have to determine location of title in order to determine if the security interest is in the nature of a conditional sale."

G.S. 25-1-201(37), then, defines "security interest" without reference to whether title is in the vendor or the vendee under

the security agreement. The applicable taxing statutes, however, specify that ad valorem taxes will be paid by the vendee of personal property where "title to the property is retained by the vendor as security for the payment of the purchase price. . . . " The proper listing and payment of taxes therefore depends upon the location of title, and the Code provides no guidance in this search.

## CONDITIONAL SALE OR LEASE

[1] It has long been the rule with us that in determining whether a contract is one of bailment for use, a lease with an option to purchase, or one of sale with an attempt to retain a lien for the purchase price, the courts "do not consider what description the parties have given to it, but what is its essential character." A conditional sale or chattel mortgage, whatever its label, will be held to be a security agreement. "The construction put upon the contract by the parties is entitled to consideration in determining its true meaning, but they cannot, by giving a name to it, change its legal effect." *Guy v. Bullard,* 178 N.C. 228, 230, 100 S.E. 328, 329 (1919). "If the contract between the parties, as expressed in the writing, be substantially one of conditional sale, the fact that the purchase money is denominated as 'hire' or as 'rent,' and divided into sums payable at various periods throughout the term of credit, will not render the transaction one of bailment for hire, so as to subject it to the law of bailments instead of the law of conditional sales or mortgages." *Hamilton v. Highlands,* 144 N.C. 279, 284, 56 S.E. 929, 931 (1907). *Accord, Wilcox v. Cherry,* 123 N.C. 79, 31 S.E. 369 (1898) ; *Barrington v. Skinner,* 117 N.C. 48, 23 S.E. 90 (1895) ; *Puffer v. Lucas,* 112 N.C. 378, 17 S.E. 174 (1893). *See* 67 Am. Jur. 2d, *Sales* § 27 (1972).

[2] Whether an agreement constitutes a conditional sale or a contract of a different character is a question of the parties' intent as shown by the language they employed. In ascertaining its true character "the whole contract is to be considered and no detached term or condition is to be given prominence or effect over another. The question of intent is one of fact to be determined from the circumstances surrounding each case; and the situation of the parties, their purpose, the thing they sought to accomplish and the method they employed, are all important." 78 C.J.S., *Sales* § 555 (1952).

[3] One of the principal tests for determining whether a contract is one of conditional sale or lease is whether the party is

obligated at all events to pay the total purchase price of the property which is the subject of the contract. If the return of the property is either required or permitted, the instrument will be held to be a lease; if the so-called lessee is obligated to pay the purchase price, even though it be denominated rental, the contract will be held to be one of sale. Annot., 175 A.L.R. 1366, 1384 (1948). "A lease of personal property is substantially equivalent to a conditional sale when the buyer is bound to pay rent substantially equal to the value of the property and has the option of becoming, or is to become, the owner of the property after all the rent is paid. . . . " 8 C.J.S., *Bailments* § 3(3) (1962). *See* 67 Am. Jur. 2d, *Sales* § 31 (1972).

In 2 Williston on Sales, § 336 (1948), we find the following pertinent exposition: "It is, however, essential in order to make a conditional sale, in the sense in which that term is used ordinarily in statutes or elsewhere, that the buyer should be bound to take title to the goods, or at least to pay the price for them. Therefore, a lease which provides for a certain rent in installments is not a conditional sale if the lessee can terminate the transaction at any time by returning the property, even though the lease also provides that if rent is paid for a certain period, the lessee shall thereupon become the owner of the property. And though the rent is to be applied at the buyer's option toward the payment of the price, the transaction is not a conditional sale if the price largely exceeds the rent that the lessee is bound to pay." *See Equilease Corp. v. Donahue,* 10 Ohio St. 2d 81, 226 N.E. 2d 721 (1967).

[4] The circumstances which led to the execution of the contract and the action of the parties thereafter are for our consideration in determining whether they intended a lease or a conditional sale. *Bell v. Concrete Products, Inc.,* 263 N.C. 389, 139 S.E. 2d 629 (1965); McCormick on Evidence, § 220 (1954). " 'The conduct of the parties in dealing with the contract indicating the manner in which they themselves construe it is important, sometimes said to be controlling in its construction by the court.' *Bank v. Supply Co.,* 226 N.C. 416, 432, 38 S.E. 2d 503." *Preyer v. Parker,* 257 N.C. 440, 446, 125 S.E. 2d 916, 920 (1962). Frequently the intention of the parties "can best be gathered from the practical construction of the contract which [they] themselves have adopted and observed during the period of harmonious operation." *Cole v. Fibre Co.,* 200 N.C. 484, 488, 157 S.E. 857, 858 (1931).

The evidence discloses that in 1966 Balentine's sold Szabo the good will and equipment of the profitable cafeteria it was then operating in the premises which Szabo immediately thereafter leased from York for a period ending 31 December 1976. Szabo's rental was the *greater* of a designated sum or six percent of the gross annual sales of the business. In 1969, when its lease still had over seven years to run, Szabo's president came to Balentine's president "with an offer to please come back and take over this operation." He "talked like" they wanted Balentine's "to take it over pretty bad." So anxious was Szabo for Balentine's to take over that it agreed to pay the cost of new leasehold improvements and new equipment installed in the demised premises under Balentine's direction in an amount not to exceed $50,000. Balentine's used this sum to tear down "what they had done to our profitable place."

From the foregoing it is a fair inference that Szabo was losing considerable money in the business which Balentine's had operated profitably, and that it faced a substantial loss over a seven-year period unless Balentine's could be induced "to come back in and take over." It is apparent that Szabo's main purpose in obtaining the contract was to have Balentine's rescue it from a failing business venture by taking over the operation of the cafeteria for the duration of its lease and that its agreement to transfer the equipment to Balentine's at the end of it lease was merely incidental to its primary objective—to insure the continued and successful operation of a cafeteria in the leased premises through 31 December 1976. The transfer of the equipment, which on 31 December 1976 would have little, if any, value to Szabo, was regarded by both parties as merely a fringe benefit to Balentine's if it was still operating the cafeteria at the end of Szabo's lease with York and if it wanted to continue in the cafeteria business at that location.

At the time Balentine's took over the operation of the cafeteria under its contract with Szabo of 14 August 1969 the cafeteria equipment was over nine years old, Balentine's having acquired it on 20 March 1960. It was six years old when Balentine's sold it to Szabo in 1966. Under Treasury guidelines, which permitted the equipment to be depreciated over a period of ten years as an income tax deduction, Szabo started depreciating the equipment in 1966 and "the ten years would run out" at the end of its lease with York. Szabo's president, Longworth, told Balentine that the right to take this depreciation as an income

---

---

tax deduction enabled Szabo to lease the cafeteria to Balentine's and to "put (in) this fifty thousand dollars which they would add to their depreciation." At no time has Balentine's taken any depreciation upon the cafeteria equipment or carried it on its books as a capital asset.

Only a taxpayer who has a present depreciable interest in property may take a deduction for depreciation. The allowance for depreciation allowed by Section 167 of the Internal Revenue Code is deductible by the one who has made the investment of capital which is to be recovered through the allowance and whose capital is decreasing at the time of the allowance. *Reisinger v. Commissioner of Internal Revenue*, 144 F. 2d 475 (2d Cir. 1944); 47 C.J.S., *Internal Revenue* § 365 (1946); 26 U.S.C.S. § 167. Notes 18 and 21 (1974).

In our view the provisions of the contract, the circumstances which led to its execution, and the subsequent conduct of the parties with reference to it are entirely inconsistent with any contention that the contract they denominated a lease was actually a conditional sales agreement. On the contrary, they compel the conclusion that the contract was a lease and that title and sole ownership of the cafeteria equipment remains in Szabo.

Szabo, as an alleged conditional vendor, failed to protect itself against possible claims against Balentine's by registering the contract as a security agreement pursuant to the filing provisions of Article 9 of the Code (G.S. 25-9-304 and G.S. 25-9-401 (1) (c)). It did, however, in due course, list and pay the ad valorem taxes on the equipment for the year 1970.

Aside from the fact that the contract speaks in terms of a sublease of premises in which a cafeteria is being operated and a lease of the equipment being used therein, under all the tests for determining whether an agreement is a lease or a conditional sale, this contract is a lease. It imposes upon Balentine's no obligation to buy the equipment; no purchase price is specified and no value is placed upon the equipment. Balentine's rent is based solely upon its gross retail sales from the operation of the cafeteria, an amount which has no relation to the value of the equipment.

Although Szabo leased the premises and cafeteria equipment to Balentine's for the remainder of its lease from York, Balentine's is not *bound* to make rental payments until then.

Balentine's assumed responsibility for the operation of the cafeteria for only two years from the date on which it reopened the cafeteria for business. These two years expired not later than 1 October 1971. Therefore, Balentine's now has the option to terminate its contract with Szabo at any time. In such event the contract *requires* it to return to Szabo all the equipment Szabo delivered to it, and all additions made thereto in the operation of the cafeteria, intact, in operable condition, and connected for operation, reasonable wear and tear and casualty damage excepted.

With no guarantee that Balentine's would continue to operate the business until the end of its lease, ordinary business prudence would require Szabo to retain title to the equipment in order to protect itself in the event Balentine's should choose to give up the cafeteria and Szabo be required to take over. Only by continuing to operate the cafeteria until the expiration of Szabo's lease, which Balentine's is not bound to do, can Balentine's acquire title to the equipment. However, the contract requires Szabo to transfer the equipment to Balentine's "without further charge" if it operates the cafeteria through 31 December 1976.

Here it is important to note that the equipment will then be almost seventeen years old; that at the termination of the lease Szabo will have fully depreciated the property and that "much of it is built to order and made for that particular location." As Balentine testified, "If we couldn't get together with Cameron Village [York] we naturally would be looking for another location." He added that, in the negotiations, "it was a minor thought that if everything went right" on 1 January 1977, when Szabo would be free of its lease, Balentine's could continue the business there without interruption if it wanted to. In that event this arrangement would also relieve Szabo of the inconvenience and expense of removing and disposing of fully depreciated equipment.

[5] It was only the provision that Balentine's will become the owner of the equipment at the end of the term of the agreement without paying any additional consideration which caused the Court of Appeals to hold that the contract was "not a leasing or bailment arrangement but rather provided Szabo with a security interest in the cafeteria equipment and is in reality a conditional sale of these items." Its decision was based solely upon Section (b) of the last sentence of G.S. 25-1-201(37).

Food Service v. Balentine's

It may be conceded that when a lessee, pursuant to an agreement that upon compliance with the terms of the lease he shall become the owner of the property for no additional consideration, has made periodic payments which relate to the property and are commensurate with the value or stated purchase price of the property the purported lease is in reality a security agreement. However, this is not the situation here. Despite the provision for the conveyance of the equipment to Balentine's without additional consideration, clause (b) of G.S. 25-1-201(37) simply does not fit the facts of this case; nor is it consistent with the fundamental proposition that to create a security interest the parties must have intended to create one. *See* G.S. 25-9-102(1)(a) and other Code provisions cited *supra;* 68 Am. Jur. 2d, *Secured Transactions* § 6 (1973).

The same considerations which refute the contention that the contract was a conditional sale negate any intention to create a security interest in the equipment. However, since this is not an action under the Code to enforce a security interest we need not determine whether, under different circumstances, by the fiat of clause (b) in the last sentence of G.S. 25-1-201(37), the contract might have legal consequences the parties did not contemplate. As heretofore pointed out, under the Code the rights and duties of the parties to a security transaction are without reference to the location of title to collateral, that is, property subject to a security interest.

[4] We hold that the agreement is not a conditional sale of the cafeteria equipment; that title to the property is in Szabo and, as owner, Szabo is required to list it for taxes. The judgment of Judge Hobgood must be affirmed.

The decision of the Court of Appeals is

Reversed.