In re **MERRITT DREDGING COMPANY, INC., Debtor.**

**COMPLIANCE MARINE, INC., Plaintiff—Appellant,**

v.

Kevin **CAMPBELL, Trustee—Appellee.**

No. 87–2065.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 5, 1987.
Decided Feb. 12, 1988.

Frederick Albert Gertz (Gertz, Kastanes & Moore, Columbia, S.C., on brief), for plaintiff-appellant.

Kenneth Arthur Campbell, Jr. (Bell, Campbell, Chard & McNeill, Mount Pleasant, S.C., on brief), for trustee-appellee.

Before RUSSELL, WILKINSON, and WILKINS, Circuit Judges.

WILKINSON, Circuit Judge:

In 1983, Merritt Dredging Company entered into an agreement with Compliance Marine, Inc. for the use of a barge. When Merritt filed for bankruptcy in 1984, a trustee took possession of all of Merritt's personal property, including the barge. Compliance sought to recover the barge or the proceeds from its sale, but the bankruptcy court found Compliance's interest in the barge to be subordinate to that of the trustee. The district court affirmed the bankruptcy court's decision, and Compliance appeals. We affirm.

## I.

Compliance is a Louisiana corporation with its principal place of business in Louisiana. Merritt is a South Carolina corporation with its principal place of business in that state. In the spring of 1983, Merritt sought from Compliance a barge for use at a project in Mississippi. Compliance prepared and executed a "charter party," which it mailed to Merritt in Charleston, South Carolina. Merritt made certain changes to the charter party, executed it, and returned it to Compliance, asking Compliance to accept the changes by initialing. Compliance did so and delivered the barge to Merritt in Louisiana.

The final agreement between the parties called for Merritt to hire the barge for three months at the rate of $2,500 per month. It also gave Merritt the "right and option" to renew the agreement at the same rate on a month-by-month basis after the initial three-month period. The charter party was written on a standard form contract, to which the parties added a clause which stated, "[i]f barge is purchased within the term of this Charter Party Agreement, 100% of Charter Hire shall apply to the purchase price of $30,000." The agreement also required Merritt to insure the barge at its expense. Merritt purchased insurance on the barge which contained navigational limits confining the use of the barge to Louisiana, Mississippi, and Texas. The charter party required Merritt to abide

by the provisions of the insurance policy. Unlike our dissenting brother, however, we do not read the agreement itself to impose any navigational limits.

Merritt exercised its option to renew after the initial three-month period, and made payments under the charter party for five months, through October, 1983. In March, 1984, Merritt filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. The proceeding was converted in September, 1984 to a Chapter 7 proceeding, and a trustee was appointed. The trustee took possession of all of Merritt's personal property, including the barge, which was then located in Charleston, South Carolina.

The trustee moved to sell the barge for $20,000 in October, 1984, and Compliance objected to the sale. When the parties agreed that Compliance's interest in the barge would be transferred to the proceeds of the sale, the barge was sold. After the sale, Compliance moved for payment of its claim, and the trustee objected to the claim. The bankruptcy court sustained the trustee's objection and denied Compliance's motion for payment, holding that Compliance's interest in the barge was subordinate to that of the trustee. The district court affirmed, and Compliance brought this appeal.

Here, as below, the contentions center chiefly on the question of choice of law. The trustee asserts that Merritt's interest in the barge is governed by South Carolina law. Under South Carolina law, the trustee argues, the charter party represents a security agreement, and Compliance's failure to perfect its interest in the barge by filing rendered its interest subordinate to that of the trustee. Compliance argues that Louisiana's law, which does not recognize conditional sales, governs the determination of the interests conveyed by the charter party. Compliance contends that under Louisiana law the charter party represents a lease which conveyed no ownership interest to Merritt, and that the barge is therefore not part of the debtor's estate.

## II.

### A.

The determination of property rights in the assets of a bankrupt's estate is generally a matter of state law. *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979). Because the property right at issue in this case grows out of a transaction having significant contacts to two states, we must first decide whether the law of South Carolina or that of Louisiana determines the extent of Merritt's interest in the barge. We conclude that South Carolina law is applicable.

In *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), the Supreme Court held that a federal court sitting in diversity must apply the choice of law rules of the state in which it sits. The *Klaxon* rule rested on the rationale that a federal court, in determining state law issues which arise in federal court only by the accident of diversity, must apply state law, including state conflict of law rules, to those issues. *Id.; Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). That same principle applies where a federal court addresses state law claims under its pendent jurisdiction. *Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313, 316 (2d Cir.1983), *cert. denied,* 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 562 (1984); *System Operations, Inc. v. Scientific Games Development Corp.,* 555 F.2d 1131, 1136 (3d Cir.1977).

The question of what choice of law rules should be applied by a bankruptcy court presents another wrinkle. Although bankruptcy cases involve federal statutes and federal questions, a bankruptcy court may, as here, face situations in which the applicable federal law incorporates matters which are the subject of state law. It is clear that a federal court in such cases must apply state law to the underlying substantive state law questions. Whether a court in such a situation must apply the conflicts rule of the forum state in determining *which* state's law to apply or may choose the applicable state law as a matter

of independent federal judgment, however, has remained an open question. *See* 1A Moore's Federal Practice ¶ 0.325 (2d ed. 1985). We believe, however, that in the absence of a compelling federal interest which dictates otherwise, the *Klaxon* rule should prevail where a federal bankruptcy court seeks to determine the extent of a debtor's property interest.

The argument for applying the *Klaxon* rule to state law questions arising in bankruptcy cases is compelling. A uniform rule under which federal bankruptcy courts apply their forum states' choice of law principles will enhance predictability in an area where predictability is critical. Most important, such a rule would accord with the model established by *Erie* and *Klaxon*. Both those cases make clear that federal law may not be applied to questions which arise in federal court but whose determination is not a matter of federal law: "[e]xcept in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State." *Erie,* 304 U.S. at 78, 58 S.Ct. at 822. Such is the case with questions regarding the extent of a bankruptcy debtor's property interests. "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner,* 440 U.S. at 55, 99 S.Ct. at 918. It would be anomalous to have the same property interest governed by the laws of one state in federal diversity proceedings and by the laws of another state where a federal court is sitting in bankruptcy. Because no overwhelming federal policy requires us to formulate a choice of law rule as a matter of independent federal judgment, we adopt the choice of law rule of the forum state, South Carolina.

**B.**

South Carolina has adopted the Uniform Commercial Code, including its choice of law provision, § 1–105. That statute provides, in relevant part:

> [W]hen a transaction bears a reasonable relation to this State and also to another state or nation the parties may agree that the law either of this State or of such other state or nation shall govern their rights and duties. Failing such agreement this act applies to transactions bearing an appropriate relation to this State.

S.C. Code Ann. § 36–1–105(1) (Law.Co-op. 1976). Under § 36–1–105, South Carolina law will be applied in determining the extent of the property interest in the barge conveyed to Merritt by the charter party if the charter party bears an "appropriate relation" to that state.[1]

The term "appropriate relation" is not defined in § 36–1–105, and South Carolina's courts have not interpreted it. The UCC's Official Comments provide little guidance, stating only that "the question what relation is 'appropriate' is left to judicial decision," and that, in defining the term, courts are "not strictly bound by [choice of law] precedents established in other contexts [because the UCC] is in large part a reformulation and restatement of the law merchant and of the understanding of a business community which transcends state and even national boundaries." U.C.C. § 1–105 official comment 3 (1978).

The majority of courts, however, has defined "appropriate relation" in accord with the dominant trend in modern conflict of laws analysis, under which the law of the state with the "most significant relationship" to the matter at issue is applied. *Golden Plains Feedlot, Inc. v. Great Western Sugar Co.,* 588 F.Supp. 985, 990 (D.S.D.1984). In some cases courts have defined "appropriate relation"

---

**1.** In bankruptcy proceedings, the extent of a debtor's property interest in a given asset is a matter of state law. *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979). The UCC and South Carolina's Commercial Code govern contractual transactions, and not property interests *per se.* The property interest involved in this case, however, grows out of such a transaction, and § 1–105 governs the choice of the law to be applied in determining the rights of parties to such a transaction.

by incorporating the forum state's general contract choice of law rule, but these cases typically involve forum states whose general choice of law rule adopts the "most significant relationship" test.[2] *See, e.g., Bunge Corp. v. Biglane,* 418 F.Supp. 1159 (S.D.Miss.1976); *General Electric Credit Corp. v. R.A. Heintz Construction Corp.,* 302 F.Supp. 958, 961–62 (D.Or.1969). Because the most significant relationship test best promotes the UCC's policies of uniformity and predictability, *see* Note, *Conflicts of Laws and the "Appropriate Relation" Test of Section 1–105 of the Uniform Commercial Code,* 40 Geo.Wash.L. Rev. 797, 804–07 (1972), and thereby most effectively facilitates interstate commercial relations, we use it to determine whether the charter party bears an "appropriate relation" to South Carolina. *See* Restatement (Second) of Conflict of Laws § 6 comment d (1971) [hereinafter *Restatement*] ("[c]hoice-of-law rules, among other things, should seek to further harmonious relations between states and to facilitate commercial intercourse between them").

### C.

The Restatement directs that the effect of a conveyance of an interest in a chattel be determined by the law of the state which has the most significant relationship to the parties, the chattel, and the conveyance, as determined with reference to the following factors:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Restatement* §§ 6, 244. Application of these factors shows that South Carolina has the most significant relationship to the charter party, and therefore an appropriate relation to it under § 36–1–105.

■ The needs of the interstate system, the relevant policies of the forum, the basic policies underlying the particular field of law, and the need for certainty, predictability, and uniformity of result all clearly call for the application of South Carolina law. The policy of encouraging commercial intercourse through the application of laws which are uniform across jurisdictions is fundamental to the field of commercial law. *See* U.C.C. § 1–102(2)(c) (1978). South Carolina adopts this policy. *See* S.C. Code Ann. § 36–1–102(2)(c). Louisiana, on the other hand, is the one state which has not adopted the Uniform Commercial Code. While Louisiana is under no obligation to adopt the UCC, it is a basic principle that choice of law rules must be applied with an eye to facilitating the operation of the interstate system: "[c]hoice-of-law rules, among other things, should seek to further harmonious relations between the states and to facilitate commercial intercourse between them." *Restatement* § 6 comment d. The application of South Carolina law in this case will lead to greater certainty, predictability, and uniformity, and will facilitate the smooth operation of the interstate commercial system.

We do not dismiss Louisiana's interest out of hand, however. We must also address the relative interests of the states involved in this dispute. Louisiana has a valid interest in the application of its own commercial law, particularly where one of the parties to a transaction is a Louisiana corporation, and where the property conveyed by the transaction was located, at

---

**2.** While South Carolina's general contract choice of law rule calls for the application of the law of the place of contracting, *Cantey v. Philadelphia Life Ins. Co.,* 166 S.C. 181, 187, 164 S.E. 609, 611 (1932), the South Carolina Reporter's Comments to § 36–1–105 indicate that South Carolina, in adopting that provision, intended the "appropriate relation" test to differ from its traditional rule. *See* S.C. Code Ann. § 36–1–105, South Carolina Reporter's Comments (1976).

least initially, in Louisiana. The fact that Louisiana has not adopted the UCC does not mean that Louisiana may never possess the most significant relation to a particular transaction. Nor is a Louisiana corporation invariably governed by the laws of another state each time it deals with the citizens of that state.

Here the relative interests of the states may be judged by comparing the relationships of the states to the parties, the conveyance, and the chattel conveyed. *See Restatement* § 244 comment d. Although the barge was located in Louisiana at the time of delivery, the fact that the parties intended it to leave that state immediately after delivery lessens Louisiana's interest.[3] "[W]hen it is understood that the chattel will be kept only temporarily in the state where it was located at the time of the conveyance ... it is more likely that ... some other state will have the most significant relationship to the parties, the chattel and the conveyance and be the state of the applicable law." *Restatement* § 244 comment f. The relationships between the states and the parties, and between the states and the conveyance, are of equal significance: while Compliance executed the charter party in Louisiana, it then mailed it to Merritt in South Carolina, where the latter executed it.

Finally, the justified expectations of the parties must be considered. "[I]t would be unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state." *Restatement* § 6 comment g. Compliance argues that it was entitled to rely on Louisiana law, but Compliance knew that the conveyance of the barge had important contacts with South Carolina and that the

barge was not intended to remain in Louisiana after the execution of the contract. Compliance, for example, knew that Merritt had possession of the barge for months after it had ceased to make payments under the charter party and before it filed for bankruptcy. The barge remained in South Carolina during the period after Merritt's default. The logical place for the filing of a bankruptcy petition was South Carolina, the debtor's state of residence. While Merritt's default and bankruptcy occurred after execution of the contract, Compliance was not justified in relying on Louisiana law to excuse its failure to take any steps to protect its interests, particularly where perfecting its interest in South Carolina posed no serious inconvenience or risk to Compliance.

The Restatement factors in combination [4] lead us to conclude that South Carolina bears the most significant relationship to the charter party. While some of those factors argue equally for the application of South Carolina or Louisiana law, all of the factors that point toward the application of one state's law argue strongly in favor of South Carolina's. The charter party therefore bears an "appropriate relation" to that state under § 36–1–105. We in turn apply South Carolina law in determining the extent of the property interests conveyed by the charter party.

## III.

The district court found that Merritt and Compliance intended the charter party as a security agreement. We agree with this characterization of the interests conveyed by the charter party.

Whether a putative lease actually represents a security agreement depends pri-

---

3. Section 244(2) of the Restatement provides that greater weight will normally be given to the location of a chattel at the time of conveyance than to any other contact in determining the applicable law. The Restatement goes on to say, however, that where, as here, the parties to a conveyance do not intend a chattel to remain in the state where it is located at the time of conveyance, the weight to be given to location is significantly lessened. *Restatement* § 244 comment f.

4. The Restatement also directs us to consider "ease in the determination and application of the law to be applied." *Restatement* ¶ 6(g). While this consideration "should not be overemphasized," *Restatement* § 6 comment j, the UCC's uniformity and common acceptance makes it easiest for this court to determine and apply South Carolina's law.

marily upon the intent of the parties. S.C. Code Ann. § 36–1–201(37). The intent of the parties must be measured by the application of an objective standard to the facts of each case. 1 G. Gilmore, Security Interests in Personal Property § 11.2 at 338 (1965). The parties' characterization of the charter party as a lease is not controlling, *e.g.*, *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.*, 532 F.2d 166, 171 (10th Cir.1976), and we accordingly look to "the true relationships and economic realities created by the agreement" to determine the interests conveyed by it. *Sight & Sound of Ohio, Inc. v. Wright*, 36 B.R. 885, 889 (S.D. Ohio 1983).

South Carolina's Commercial Code defines a "security interest" as "an interest in personal property or fixtures which secures payment or performance of an obligation." S.C. Code Ann. § 36–1–201(37). It continues:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

*Id.* The trustee argues that the charter party allowed Merritt to purchase the barge for no additional consideration after twelve monthly "rental" payments, and that it is therefore a security agreement. Compliance, on the other hand, contends that Merritt was required to make only three payments under the charter party, that Merritt was therefore not obligated to pay the full purchase price, and that as a result the charter party does not represent a security agreement.

While it is true that a lease may be found to be a security agreement only if it places an obligation on the lessee, S.C. Code Ann. § 36–1–201(37); *In re Peacock*, 6 B.R. 922, 924 (Bankr.N.D.Tex.1980), the district court did not err in finding that the charter party was intended as a security agreement. An obligation to purchase may be found even where an agreement does not explicitly require the putative lessee to make sufficient payments to allow the exercise of a purchase option with no further consideration. *See In re Joe Necessary and Son, Inc.*, 475 F.Supp. 610, 612 (W.D.Va.1979); *United Rental Equipment Co. v. Potts & Callahan Contracting Co.*, 231 Md. 552, 558–59, 191 A.2d 570, 573–74 (1963). The terms of the charter party created significant economic compulsion to purchase the barge, and the facts of this case indicate that the parties intended a conditional sale.

The charter party was written on a standard form. It required payments for an "initial term" of three months, after which Merritt had the unqualified "right and option" to renew on a month-to-month basis. Monthly payments were $2,500. The parties added to the form agreement the clause, "[i]f barge is purchased within the term of this Charter Party Agreement, 100% of Charter Hire shall apply to the purchase price of $30,000," giving Merritt the opportunity to acquire the barge with no additional consideration after twelve monthly payments.

Merritt exercised its renewal option, making five monthly payments of $2,500. Neither Merritt nor Compliance ever indicated a desire to terminate the charter party, and Merritt remained in possession of the barge for more than twelve months before Compliance acted to regain possession of the barge. In short, the parties treated the charter party as if it were a conditional sale. While these acts and failures to act occurred after execution of the contract, the parties' actions with regard to the executed contract are some evidence of their intent in executing it. *Szabo Food Service, Inc. v. Balentines, Inc.*, 285 N.C. 452, 462, 206 S.E.2d 242, 250 (1974).

The monthly "rent" paid by Merritt represented exactly one-twelfth of the purchase price of a barge with a useful life of many years. The charter party required Merritt to pay at least 25% of the purchase price. The obligation of a "lessee" to pay the full purchase price need not be express;

a security agreement may be indicated where it can reasonably be anticipated that an option to purchase will be exercised. *Sight & Sound,* 36 B.R. at 889; *In re Peacock,* 6 B.R. at 925–26. Because its payments were all credited toward the purchase price, Merritt acquired substantial "equity" in the barge, which would be lost if it failed to exercise its purchase option. *See In re Joe Necessary and Son, Inc.,* 475 F.Supp. at 614 & n. 8. The pressures to purchase indicate that the parties intended the charter party as a conditional sale. Finally, the charter party placed on Merritt several of the incidents of ownership. For example, Merritt bore the risk of loss or damage, and was required to insure the barge. *See Sight & Sound,* 36 B.R. at 890.

South Carolina's Commercial Code provides that that state's version of Article 9 applies:

> (1) ... so far as concerns any personal property and fixtures within the jurisdiction of this State
>
> (a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures ...

S.C. Code Ann. § 36–9–102(1)(a). The charter party bears sufficient earmarks of a security agreement to support the district court's finding that the parties intended it as such. We therefore determine the parties' relative interests in the barge with reference to South Carolina's law of secured transactions.

## IV.

Because the charter party represented a security agreement, Compliance's failure to perfect its interest in the barge rendered its interest subordinate to that of the trustee. South Carolina's Commercial Code provides:

> If the chief place of business of a debtor is in this State, this chapter governs the validity and perfection of a security interest and the possibility and effect of proper filing with regard to general intangibles or with regard to goods of a type which are normally used in more

than one jurisdiction ... if such goods are classified as equipment ...

S.C. Code Ann. § 36–9–103(2). Merritt's chief place of business is in South Carolina. The barge is a good normally used in more than one jurisdiction and, as a good used primarily in business, is classified as equipment. S.C. Code Ann. § 36–9–109(2). South Carolina's Article 9 therefore governs the validity and perfection of Compliance's security interest in the barge.

In order to perfect, Compliance was required to file a financing statement. S.C. Code § 36–9–302(1). Compliance concedes that it did not take this simple and customary step, and its interest is therefore subordinate to that of a lien creditor. S.C. Code § 36–9–301(1)(b). Because the trustee has the rights of a lien creditor, 11 U.S.C. § 544(a)(1) (1982), Compliance's interest in the barge is subordinate to that of the trustee.

## V.

This case presents both legitimate claims of diversity among the laws of several states and claims for uniformity of practice in interstate commercial transactions. Louisiana is entitled to adopt its own laws in this area, and its citizens are entitled to rely upon them in appropriate cases. Had the facts of this particular transaction tilted toward Louisiana, the law of that state would govern. Here, however, South Carolina's own substantial connection with this transaction and this court's obligation to resolve choice of law questions with an eye toward the ends of uniform commercial practice persuades us that South Carolina law must control.

Compliance argues that the barge's connection to South Carolina is fortuitous, but its connection to Louisiana is equally so. While the barge was delivered in Louisiana, the parties intended it to leave that state immediately. The charter party was executed and negotiated in both Louisiana and South Carolina. Compliance knew of Merritt's and the barge's connection to South Carolina. Filing a financial statement in that state was neither an obscure nor onerous requirement and would have posed no

serious risk or inconvenience to Compliance. The perfection of security interests through appropriate filings serves important commercial purposes. Here Compliance had an obligation to perfect its interest in order to place Merritt's future creditors on notice, an obligation that took on added force when Merritt defaulted on its obligations under the charter party.

The judgment of the district court is hereby

AFFIRMED.

DONALD RUSSELL, Circuit Judge, dissenting.

The dispositive issue in this case is one of jurisdiction. If the transaction is treated as controlled by Louisiana law, then Compliance Marine is entitled to an order fixing ownership of the barge in it; should the transaction be resolved under South Carolina law, it is equally clear that the trustee in bankruptcy must prevail. The issue is to be decided by applying the "most significant relationship" test to the transaction.

The transaction under which Merritt acquired possession of the barge was represented by a written agreement, dated May 24, 1983, drafted and agreed on by the parties in Louisiana. Since Merritt's corporate headquarters were located in South Carolina, the contract was sent to South Carolina for formal signature by Merritt. All payments under the contract whereby Merritt had possession of the barge were received in Louisiana.

The barge was leased to Merritt for use in work on the Mississippi River under a contract with the federal Corps of Engineers. The work itself was controlled from New Orleans. The lease contract expressly limited the use and location of the barge for the life of the agreement to the Mississippi River basin. The contract for the use of the barge, however, was cancelled by the Corps of Engineers. After this cancellation, Merritt, without the knowledge of Compliance and contrary to the express language of the agreement under which it had secured possession of the barge, sailed the barge to South Carolina and shortly thereafter this bankruptcy proceeding ensued.

In my view, the "most significant relationship" of the transaction was to Louisiana and not to South Carolina and, under accepted conflict-of-laws principles, the contract between Compliance and Merritt was to be treated as controlled by Louisiana law. Restatement (Second) of Conflict of Laws §§ 6, 244 (1969). Under Louisiana law, a lease which binds the putative lessee to make "rental" payments equal to the purchase price of the item leased is considered a sale. *Lee Constr. Co. v. L.M. Ray Constr. Corp.*, 219 La. 246, 52 So.2d 841 (1951). A lease without this obligation to make payments for the full amount, but with only an option to do so is considered merely a lease with an option to purchase. *Id.*, 52 So.2d at 842.

Under the contract, Merritt was obligated to make only three monthly payments for the barge. The total value of these three payments, $7,500.00, is not even close to the purchase price of the barge as stated in the contract, $30,000.00. Merritt also had an option to continue making the payments, and after making twelve could have purchased the barge for no additional consideration. But, it was under no obligation to do so. It appears, therefore, that under Louisiana law the contract must be construed as a true lease with an option to purchase, and not a sale.

The fact that Merritt took the barge into South Carolina without the knowledge and approval of Compliance and against the express terms of the contract cannot defeat Compliance's rights under what I conceive to be its Louisiana agreement and render the validity of Compliance's title subject to the South Carolina recordation statutes, *e.g.*, S.C. Code Ann. § 27–23–80 (Law.Co-op.1976) as a South Carolina contract. I would, therefore, sustain the claim of Compliance to the barge and dissent from the contrary holding of the majority opinion herein.