**In re Robert PUTMAN and Kathy Putman, Debtors.**

**Robert O. TYLER, Trustee, Plaintiff,**

**v.**

**Robert PUTMAN and Kathy Putman and Xerox Corporation, Defendants.**

**Bankruptcy No. 87–00120–A.**
**Adv. No. 87–0738–A.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Feb. 14, 1990.

Henry Counts, Jr., Alexandria, Virginia, for debtors.

Arnold S. Albert, Thomas, Hirsch & Albert, P.C., Washington, D.C., for Robert O. Tyler, trustee.

Daniel M. Lewis, Arnold & Porter, Washington, D.C., for Xerox Corporation.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

We are called upon to determine whether the debtor's interest in funds under a profit sharing plan sponsored by Xerox Corporation ("defendant" or "Xerox") is excluded from property of the estate under § 541(c)(2) of the United States Bankruptcy Code ("Code").

Robert and Kathy Putman ("debtors") filed a petition under Chapter 7 of the Code on January 23, 1987. On the schedule of exempt property, the debtors listed as exempt Kathy Putman's profit sharing accounts with her employer, Xerox. An unsecured creditor, Sterling One Industrial Limited Partnership, filed an objection to the designation of the Xerox Plan accounts as exempt property. By order dated June 24, 1987, this Court granted an exemption on the Xerox Plan accounts.[1] The trustee subsequently filed a Complaint for Turnover of Assets against the Putmans and Xerox Corporation. On April 26, 1988 the trustee filed a motion for summary judgment. Defendant Xerox Corporation filed a cross-motion for summary judgment on June 3, 1988.

In view of the fact that this matter comes before the Court on motions for summary judgment, the basis upon which we may issue judgment is outlined by Federal Rule of Civil Procedure 56 (Rule 56), made applicable to this proceeding by Bankruptcy Rule 7056. Pursuant to Rule 56, a movant is entitled to summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Both the plaintiff trustee and defendant Xerox agree that no genuine issue of material fact exists.[2] Accordingly, the Court must determine whether the trustee or Xerox is entitled to judgment as a matter of law. To make a determination as to whether the Xerox Plan accounts are excluded or exempt from the bankruptcy estate as a matter of law, we first must examine the nature of the accounts.

The Xerox Profit Sharing Retirement and Savings Plan ("Plan")[3] qualifies as a plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), which Congress enacted to regulate private pension plans and protect employees participating in such plans. See H.R.Rep. No.

1. In its Memorandum In Support of its Cross Motion for Summary Judgment, Xerox stated that this Court did not have the benefit of adversarial proceedings on whether the Xerox Plan accounts should be allowed as exempt property. Xerox noted that the debtors did not respond to Sterling One's objection to the designation of the accounts as exempt and Xerox, which was not a party to this Chapter 7 proceeding, did not have notice of the proceeding.

2. Xerox concedes that although the trustee misstates the structure of the Xerox Plan and the difference between, and restrictions on the various kinds of accounts, there is no genuine dispute as to the actual language of the Xerox Plan accounts. See Defendant Xerox Corporation's Statement Of Material Facts As To Which There Is No Genuine Dispute, p. 2.

3. Xerox sponsors two types of retirement plans for its employees. See "You and Xerox: 1986 Profit Sharing Retirement and Savings Plan." One plan, the Xerox Profit Sharing Retirement

and Savings Plan, specifies in a formula, the annual contribution that the company makes to the Plan. Under the Plan, an employee's retirement benefit is based on the value of the employee's account at retirement. A Xerox employee automatically becomes a Profit Sharing Plan Member when the employee completes one year of service with Xerox, provided that the employee has worked a minimum of one thousand hours during the year.

Xerox also sponsors the Xerox Corporation Retirement Income Guarantee Plan ("RIGP"), which specifies the minimum benefits to be paid to retired Xerox employees. RIGP is designed to ensure minimum retirement benefits in the event that an employee's profit sharing funds are insufficient to pay the employee's guaranteed retirement income. A Xerox employee participates in the RIGP on his first day of work, provided that the employee was hired before age sixty.

93–533, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.Code Cong. & Admin. News 4639 (noting that the primary purpose of ERISA is the protection of individual pension rights). To be ERISA qualified, a plan must prohibit the assignment or alienation of pension plan benefits. *See* 29 U.S.C. § 1056(d)(1) ("Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.").[4] The Xerox Profit Sharing Plan contains such an anti-alienation clause that provides in pertinent part:

> [N]one of the benefits, payments or proceeds arising out of or by virtue of the Plan shall be subject to any claim of or any legal process by any creditor of a Participant, retired Participant, or of any beneficiary, and no Participant, retired Participant, or beneficiary thereof, shall have any right to anticipate, alienate, encumber or assign any right or benefit arising out of or by virtue of the Plan. . . .

**4.** The Internal Revenue Code contains a provision which states that a trust will not be tax qualified unless the plan of which it is a part prohibits alienation or assignment of benefits. *See* 26 U.S.C. § 401(a)(13)(A) ("A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that benefits provided under the plan may not be assigned or alienated. . . .").

**5.** The Employee Before–Tax Savings Account and the Employee After–Tax Savings Account are referred to collectively as the "Employee Savings Accounts." *See* Xerox Profit Sharing Retirement and Savings Plan, § 5.01.

**6.** Article Seven of the Xerox Plan provides in part:
*Section 7.01. Normal Retirement.* Each Participant may retire from the service of the Employer at his normal retirement date. A Participant's normal retirement date is the first day of the month coincident with or next following his sixty-fifth birthday . . . A Participant who terminates employment after attaining his sixty-fifth birthday . . . shall have a nonforfeitable interest in the amounts credited to his Company Savings, Retirement and Employee Savings Accounts.
*Section 7.03. Amount of Retirement Benefits* . . . (a) The benefits to which a Participant shall be entitled upon retirement shall be such as the value of the units credited to his Company Savings, Retirement and Employee Savings Accounts will provide. . . .

*See* § 14.04 Xerox Profit Sharing Retirement and Savings Plan.

Turning to the specific accounts under the Xerox Plan, we observe that it provides eligible employees with four possible individual accounts: 1) A Retirement Account, which is funded by Xerox on the basis of company profits and employee compensation; 2) A Company Savings Account, which is funded by Xerox on the basis of company profits and employee compensation; 3) An Employee Before–Tax Savings Account, which is funded by employee contributions and 4) An Employee After–Tax Savings Account, which is funded by employee contributions.[5]

The Plan also sets forth conditions under which an employee may withdraw funds in the individual accounts. Under the Plan, an employee can gain access to his Retirement Account, his Company Savings Account and Employee Savings Accounts upon retirement,[6] death,[7] or upon termination of employment by resignation or discharge.[8] Additionally, an employee can

**7.** Article Ten of the Xerox Plan provides in part:
*Section 10.02. Death Before Retirement.* Upon the death of a Participant before retirement, the Plan Administrator shall direct the Trustee to distribute to his designated beneficiary or beneficiaries the then value of all units credited to his Retirement, Company Savings and Employee Savings Accounts. . . .

**8.** Article Nine of the Xerox Plan provides in part:
*Section 9.01. Determination of Nonforfeitable Interest* (a) Upon his resignation or discharge prior to the attainment of his normal retirement date . . . a Participant shall have a nonforfeitable interest in all amounts represented by the credit balance in his Employee Savings Account and his Company Savings Account. In addition, he shall have a nonforfeitable interest in the value of his Retirement Account consisting of the units and cash surrender value of any life insurance contracts credited to such Account, in accordance with the following schedules:
(i) Employees hired prior to January 1, 1981:

| Number of Years of Service with the Employer | Nonforfeitable Percentage |
|---|---|
| Less than 3 | 0% |
| 3 but less than 4 | 25% |
| 4 but less than 5 | 50% |
| 5 but less than 6 | 75% |
| 6 or more | 100% |

*Section 9.02. Payment of Benefits on Termination of Employment* (a) Upon his termination of employment by resignation or discharge, the

withdraw funds from his Company Savings Account and the interest portion of his After Tax Savings Account upon a showing of "financial hardship." [9] The Plan defines financial hardship as that arising from: the sickness or disability of the employee participant or his spouse; purchasing real property which is to serve as the employee participant's principal residence; financing the cost of education beyond the secondary school level for the employee participant's children; or other extraordinary financial hardship other than those set forth above pursuant to the rules established by the Plan Administrator. Finally, a Xerox employee can withdraw from his After-Tax Savings Account an amount equal to the total of his contributions to the account, provided that he has not made a withdrawal from the account within the previous three months.[10]

Kathy Putman, whom Xerox hired as an administrative assistant in January, 1976, became eligible to participate in the Plan in January, 1977. As of January 1, 1988, Kathy Putman had the following balances in three separate accounts in the Xerox Profit Sharing Plan: $27,601.73 in her Retirement Account; $1,360.93 in her Company Savings Account, and $3,080.08 in her

---

Plan Administrator shall direct the Trustee to segregate the value of his nonforfeitable interest and distribute such value to him ...

9. Section 8.05 of the Plan provides in part:
*Section 8.05. Harship Withdrawals from Company Savings Account and Appreciation Portion of Employee After-Tax Savings Account and Employee Before-Tax Savings Account.* (a) Upon the application of any Participant, the Plan Administrator, in accordance with a uniform nondiscriminatory policy, may in his discretion permit such Participant to withdraw all or a portion of the amounts then credited to his Company Savings Account and Employee Before-Tax Savings Account and the amount credited to his Employee After-Tax Savings Account in excess of the sum of the contributions credited to such Account ("Appreciation Portion") needed for the purposes of:
(i) alleviating extraordinary financial hardship arising from the sickness or disability of the Participant or his spouse, children or other dependents; or
(ii) purchasing real property which is to serve as the principal residence of the Participant; or
(iii) financing the cost of education beyond the secondary school level for children or other dependents of the Participant; or
(iv) alleviating other extraordinary financial hardship other than those set forth above pursuant to rules established by the Plan Administrator.
(b) A Participant making application under this Section 8.05 shall have the burden of presenting to the Plan Administrator proof of such need, and the Plan Administrator shall not permit withdrawal under this Section without first receiving such proof. In no event shall the total amount withdrawn under this Section 8.05 exceed the value at the time of such withdrawal of the units credited to such Participant's Company Savings Account and the Appreciation Portion of the Employee Savings Account (not including the Appreciation Portion which may be withdrawn pursuant to Section 8.06).
\* \* \* \* \* \*

The Plan Administrator shall adopt uniform rules of general applicability regarding the maximum amounts, timing and frequency of withdrawals permitted under this Section and shall also adopt rules regarding which Separate Fund or Funds any withdrawals shall be charged against.

10. Section 8.06 of the Plan provides:
*Section 8.06. Withdrawals from Employee After-Tax Savings Account.* Any Participant may, upon written application to the Plan Administrator on forms provided by the Plan Administrator for such purpose request that all or a portion of the value credited to his Employee After-Tax Savings Account not in excess of the amount of his contributions credited to such Account be withdrawn from his Employee After-Tax Savings Account and paid to him in cash as of the valuation date immediately preceding or coincident with the date of filing such request with the Plan Administrator.
If a Participant requests a withdrawal under this Section, a number of units in the Separate Funds equal in value to the amount requested for withdrawal ... shall be canceled and debited from the Participant's Employee After-Tax Savings Account. The Plan Administrator shall then instruct the Trustees to make payment of the amount requested to be withdrawn....
The Plan Administrator shall adopt uniform rules of general applicability regarding the maximum amounts, timing and frequency of withdrawals permitted under this Section and shall also adopt rules regarding which Separate Fund or Funds any withdrawals shall be charged against.
\* \* \* \* \* \*
The Xerox employee pamphlet entitled "You and Xerox, Benefits for Salaried Employees" provides that an employee may make one withdrawal every three months from his After-Tax Savings Account. *See* "You and Xerox, Benefits for Salaried Employees" p. 60.

After–Tax Savings Account.[11] To determine whether these accounts are included in the bankruptcy estate, we turn to § 541 of the Code, which governs property of the estate.

Section 541(a)(1) provides that a debtor's estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case."[12] 11 U.S.C. § 541(a)(1). The defendant Xerox concedes that Kathy Putman had a legal or equitable interest in her Plan accounts as of the commencement of this case, and that the Plan accounts, therefore, are property of the estate unless they fall within an exception to § 541(a)(1).[13]

While § 541(a)(1) brings all of the debtor's legal and equitable interests in property into the bankruptcy estate, section 541(c) prevents certain property from entering the estate.[14] Specifically, § 541(c)(1) provides in part that "[e]xcept as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate...." *See* 11 U.S.C. § 541(c)(1). Section 541(c)(2), in turn, provides that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under *applicable nonbankruptcy law* is enforceable in a case under this title." *See* 11 U.S.C. § 541(c)(2) (emphasis supplied). Thus, under § 541(c)(2),

if "applicable nonbankruptcy law" enforces restrictions on the transfer of a debtor's interest in a trust, those restrictions are enforceable in bankruptcy and such interest is excluded from the bankruptcy estate. It is the interpretation of § 541(c)(2), and in particular the phrase "applicable nonbankruptcy law," which is at the heart of the dispute in the case at bar.

The trustee, citing a number of cases to support his position, asserts that § 541(c)(2) protects a debtor's interest only in traditional spendthrift trusts created under state law. He further argues that the Xerox Plan is not a traditional spendthrift trust mainly because the debtor exercises substantial control over the funds held in trust.[15] The trustee concludes that because the Xerox Plan is not a traditional spendthrift trust under state law, the debtor's interest in the funds is not excluded from the estate pursuant to § 541(c)(2).

Disputing the trustee's contention that § 541(c)(2) protects a debtor's interest only in traditional spendthrift trusts, Xerox cites a number of cases that have interpreted the phrase "applicable nonbankruptcy law" in § 541(c)(2) as including ERISA. Specifically, Xerox would like us to find that, because transfer restrictions in the Xerox Plan are enforceable under ERISA, which courts have held is "applicable non-

---

**11.** Kathy Putman did not have any Before–Tax Savings Account.

**12.** Section 541(a)(1) of the Bankruptcy Code provides,

[t]he commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all of the following property, wherever located and by whomever held: [e]xcept as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case. 11 U.S.C. § 541(a)(1).

**13.** *See* Defendant Xerox Corporation's Memorandum In Support of Cross–Motion For Summary Judgment, p. 7.

**14.** Section 541(c) of the Code provides:

(c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

(A) that restricts or conditions transfer of such interest by the debtor; or

(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

**15.** The trustee maintains that the debtor exercises a significant amount of control over the funds in her accounts because she can withdraw funds in several of the accounts and can gain access to other funds by making an application pursuant to a "hardship petition" or by terminating her employment with Xerox.

bankruptcy law" under § 541(c)(2), such transfer restrictions are enforceable in bankruptcy and the funds thus are excluded from the estate. Xerox also maintains that the transfer restrictions in the Plan are enforceable under general state law and traditional spendthrift trust law.

In determining whether § 541(c)(2) excludes a debtor's interest in an ERISA pension plan account from the bankruptcy estate, courts have split on whether ERISA constitutes "applicable nonbankruptcy law" under § 541(c)(2). A majority of courts have relied on § 541(c)(2)'s legislative history to hold that § 541(c)(2) does not automatically exclude ERISA pension plan accounts from the bankruptcy estate. The legislative history of § 541(c)(2) provides that it "preserves restrictions on transfer of a spendthrift trust to the extent that the restriction is enforceable under applicable nonbankruptcy law." *See* H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 369, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5963, 6325. In relying on this language, courts have interpreted § 541(c)(2) as excluding from property of the estate only those spendthrift trusts traditionally beyond the reach of creditors under state law. *See In re Daniel,* 771 F.2d 1352, 1360 (9th Cir.1985) (following *In re Goff,* 706 F.2d 574 (5th Cir.1983) and holding that "applicable nonbankruptcy law" in § 541(c)(2) was intended to be a narrow reference to state "spendthrift trust" law and not a broad reference to all other laws, including ERISA and IRC, which prohibit alienation), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *In re Lichstrahl,* 750 F.2d 1488, 1490 (11th Cir. 1985) (holding that "applicable nonbankruptcy law" in § 541(c)(2) refers only to state spendthrift trust law); *In re Graham,* 726 F.2d 1268, 1271 (8th Cir.1984) (finding that "Congress did not intend 'applicable nonbankruptcy law' to include ERISA[;] [r]ather, Congress only intended by § 541(c)(2) to preserve the status [sic] traditional spendthrift trusts, as recognized by state law...."); *In re Goff,* 706 F.2d 574, 582 (5th Cir.1983) (finding that "Congress intended by its reference to 'applicable nonbankruptcy law' [in § 541(c)(2)] to

exempt from the estate only those 'spendthrift trusts' traditionally beyond the reach of creditors under state law."); *In re Lawson,* 67 B.R. 94, 97 (Bankr.M.D.Fla.1986) (adopting reasoning in *In re Goff, supra,* that Congress intended to limit the exclusion in § 541(c)(2) to trusts that traditionally have been recognized under local law as true "spendthrift trusts"); *In re Kerr,* 65 B.R. 739, 744 (Bankr.D.Utah 1986) (stating that "pension plans will be excluded from property of the estate only if they are enforceable under state law as spendthrift trusts."); *In re Flygstad,* 56 B.R. 884, 886 (Bankr.N.D.Iowa 1986); *In re DeWeese,* 47 B.R. 251, 255 (Bankr.W.D.N.C.1985).

In contrast to the majority view, some courts have held that ERISA does constitute "applicable nonbankruptcy law" under § 541(c)(2) and have excluded ERISA pension plan accounts from the bankruptcy estate on that basis. These courts have relied on the plain language of § 541(c)(2), which, on its face does not limit "applicable nonbankruptcy law" to state spendthrift trust law. Courts adopting this position have reasoned that the legislative history, rather than restricting § 541(c)(2) to state spendthrift trust law, merely clarifies that § 541(c)(2) was intended to continue the exclusion of spendthrift and support trusts to the extent that they are protected from creditors under applicable state law. *See In re Threewitt,* 24 B.R. 927, 929 (D.Kan. 1982) (stating that "[s]ince Congress did not choose to use the term 'spendthrift trust' in the language of [section 541(c)(2)] itself, there is no reason to suppose that when the term appears in the legislative history it should be taken as a term of art; it is more reasonable to suppose that the term should be given its ordinary, more general meaning as 'inclusive of all trusts which bar creditors from reaching a beneficiary's interest.'" [citation omitted]); *In re Ralstin,* 61 B.R. 502, 504 (Bankr.D.Kan. 1986) (agreeing with the District Court of Kansas in *In re Threewitt, supra,* and noting that "[t]he crucial question should not be whether the pension plan qualifies as a state spendthrift [trust] but should instead be whether the debtor's interest in

qualified ERISA plans are beyond the reach of general creditors in nonbankruptcy proceedings."); *In re Mosley,* 42 B.R. 181, 191 (Bankr.D.N.J.1984) (finding that "[t]he reference of 'applicable nonbankruptcy law' in section 541(c)(2) refer[s] to all law that might normally apply outside of bankruptcy proceedings, including ERISA"); *Warren v. G.M. Scott & Sons,* 34 B.R. 543, 544 (Bankr.S.D.Ohio 1983) (adopting reasoning in *In re Threewitt, supra* ).

Although the Fourth Circuit has considered the issue of whether a debtor's interest in a pension fund is excluded from property of the bankruptcy estate pursuant to § 541(c)(2), it has not definitively decided whether the phrase "applicable non-bankruptcy law" in § 541(c)(2) refers to ERISA. *See McLean v. Central States, Southeast & Southwest Areas Pension Fund,* 762 F.2d 1204 (4th Cir.1985). The Fourth Circuit, however, in *McLean v. Central States, Southeast & Southwest Areas Pension Fund,* 762 F.2d at 1204, has provided guidance to courts faced with the task of determining whether a debtor's interest in a pension fund is excluded from the estate pursuant to § 541(c)(2).[16]

In *McLean,* the debtor was a participant in the Central States, Southeast and Southwest Areas Pension Fund ("Pension Fund"). *See In re McLean,* 41 B.R. 893, 895 (D.S.C.1984). The pension fund constituted a "qualified trust" under ERISA and was eligible for tax exempt status under the Internal Revenue Code by virtue of a provision in the Pension Fund agreement stating that a beneficiary's interest could not be assigned or alienated. The debtor, who received monthly payments of $575.00 under the Pension Fund, filed a petition under Chapter 13 of the Bankruptcy Code and listed his monthly pension benefits as income available to fund his Chapter 13 plan.

Subsequent to the filing of his plan, the bankruptcy court in *McLean* issued an order ("pay order") pursuant to § 1325(b) of the Code requiring the Pension Fund to pay a portion of the debtor's monthly benefits directly to the bankruptcy trustee. The Pension Fund refused to comply with the pay order on the grounds that it violated the anti-alienation provision of the Pension Fund agreement and that if the Fund were to comply with the pay order, it would lose its tax exempt status. The Pension Fund filed a motion for reconsideration and the bankruptcy court again required the Pension Fund to comply with the pay order. The bankruptcy court reasoned that although the corpus of the fund was protected from the trustee pursuant to § 541(c)(2), the trustee could reach the distributions to which the debtor had already become entitled. The Pension Fund appealed the bankruptcy court's ruling to the United States District Court for the District of South Carolina, which affirmed the bankruptcy court.[17]

---

**16.** Because the *McLean* decision guides this Court to a resolution of the issue before it, we do not need to reach the issue of whether "applicable nonbankruptcy law" in § 541(c)(2) refers to ERISA.

**17.** *See In re McLean,* 41 B.R. 893 (D.S.C.1984). The district court in *McLean* affirmed the ruling of the bankruptcy court on several grounds. First, in finding that § 541(c)(2) does not exclude ERISA pension plans from the bankruptcy estate, the district court reasoned that the legislative history of § 541(c)(2) was to be narrowly construed to exclude only classic spendthrift trusts from the bankruptcy estate. The district court observed:

While the exclusion of § 541(c)(2) refers to general restrictions on transfers of beneficial interests in trusts, Congress envisioned only that the classic spendthrift trust be excluded from the bankrupt's estate.

A classic spendthrift trust is a trust "intended to secure the trust fund against the improvidence of the cestui que trust [beneficiary] by protecting it against his creditors and rendering it inalienable by him before payment ..." 89 C.J.S. Trusts § 26 (1955). "In the case of trusts containing restraints against the alienation of income, frequently known as spendthrift trusts, *the beneficiary cannot alienate the income before it becomes due.*" 90 C.J.S. Trusts § 194 (1955) (emphasis in original). *In re McLean,* 41 B.R. at 897. The district court found, in effect, that ERISA qualified pension plans were not classic spendthrift trusts despite their anti-alienation provisions. A classic spendthrift trust, the court explained, does not allow a beneficiary to transfer any portion of his interest in the trust. The court thus concluded that an ERISA pension plan was not a classic spendthrift trust because ERISA allows a beneficiary to a) assign up to 10% of any pen-

The Pension Fund then appealed the district court's ruling to the United States Court of Appeals for the Fourth Circuit. The Fourth Circuit identified the dispositive issue as whether the debtor's interest in the trust fund was bankruptcy estate property and thus subject to the pay order. *See McLean,* 762 F.2d at 1206. Finding that the pension benefits were not property of the estate, the Fourth Circuit reversed the ruling of the district court.

In reaching its decision, the Fourth Circuit first construed the relevant statutory provisions of the Bankruptcy Code relating to property of the estate. The Court noted that under § 541(a)(1), all legal or equitable interests of the debtor in property are property of the estate, except for interests defined in § 541(c)(2), which excludes from the estate, property that is subject to an enforceable transfer restriction under nonbankruptcy law. The Court observed that § 1306(a) adopts § 541's definition of estate property and, for Chapter 13 purposes, draws into the definition of estate property, after-acquired property of the debtor that would qualify under § 541 as estate property. The Court went on to conclude, therefore, that a pensioner's interest in a trust fund may become estate property in a Chapter 13 plan once paid to the debtor under the terms of the trust.

Having construed the relevant statutory provisions, the Fourth Circuit cited as the only remaining issue "whether the restriction on transfer in the Central trust agreement is enforceable under Illinois law, which governs the fund." *McLean,* 762 F.2d at 1206–07. The Court found that the anti-assignment provision [18] of the Central trust fund agreement would be enforceable under Illinois law as a valid restriction on transfer. The Fourth Circuit observed:

Illinois courts have long recognized the enforceability of spendthrift trusts, holding that their protection might run to both income and corpus. *See Von Kesler v. Scully,* 267 Ill.App. 495, 505 (1932). More recently, the Illinois courts have recognized that the spendthrift provisions of ERISA-qualified funds may be enforceable under Illinois spendthrift trust law. *See Peoples Finance Co. v. Saffold,* 83 Ill.App.3d 120, 38 Ill.Dec. 534 [536–37], 403 N.E.2d 765, 767–68 (Ill. 1980); *Christ Hospital v. Greenwald,* 82 Ill.App.3d 1024, 38 Ill.Dec. 469, 403 N.E.2d 700, 702–04 (Ill.1980).

*McLean,* 762 F.2d at 1207.

The Court found that because the Central Trust agreement's anti-assignment provision was indistinguishable in critical respects from spendthrift provisions held enforceable by the Illinois courts, the restriction was enforceable in bankruptcy pursuant to § 541(c)(2) and the debtor's pre-distribution interest in the fund thus was excluded from the estate under § 541(c)(2). *See id.* at 1206–07. The Court further noted that because the Central pension fund was not settled and revocable by a beneficiary and because contributions to the fund were made by the employer, public policy concerns would not prevent enforcement of the transfer restriction under controlling nonbankruptcy state law.

### ARTICLE VIII
### SPENDTHRIFT CLAUSE
All benefit payments to participants or beneficiaries, if and when such payments shall become due, shall, except as to person under legal disability, or as provided in Article IX, be paid to such participants or beneficiaries in person and shall not be grantable, transferable, or otherwise assignable in anticipation of payment thereof, in whole or in part, by the voluntary or involuntary acts of any such participants or beneficiaries, or by operation of law, and shall not be liable or taken for any obligation of such participants or beneficiaries.

sion benefit payment; b) encumber his interest in an ERISA plan by offering it as security for a loan; c) completely alienate his benefits under certain conditions; and d) deduct and pay union dues from an ERISA plan without the plan losing its tax exempt status.

In addition to reasoning that § 541(c)(2) applies only to classic spendthrift trusts, the district court in *McLean* found that because § 522(d)(10)(E) of the Code exempts pension funds from the bankruptcy estate, Congress must have envisioned that such funds would constitute property of the estate. *See In re McLean,* 41 B.R. at 898.

18. The anti-assignment in the Central trust agreement in *McLean* provided:

Moreover, the Fourth Circuit in dicta specifically rejected the trustee's contention in *McLean* that § 541(c)(2) should be confined in its recognition of enforceable transfer restrictions to those found in "traditional" spendthrift trusts. *See McLean*, 762 F.2d at 1207 n. 1. The Court explained:

We decline to accept the trustee's contention that § 541(c)(2) should be confined in its recognition of enforceable transfer restrictions to those found in "traditional" spendthrift trusts. The language of § 541(c)(2) does not suggest such a limitation, and the legislative history reveals only that the provision has the unambiguous purpose of preserving enforceable transfer restrictions in spendthrift trusts. *See* H.R.Rep. No. 595, 95th Cong., 2d Sess. 369, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5963, 6325. Nowhere in the statute is there a requirement that the trust be "traditional," nor is there any definition of what might be found to constitute a "traditional" trust. We therefore rely on our reading of Illinois law to conclude that the trust here in issue would be enforceable under that state's law. *But see Regan v. Ross*, 691 F.2d 81, 85–86 (2d Cir.1982).

The Fourth Circuit similarly rejected the trustee's contention in *McLean* that because § 522(d)(10)(E) expressly exempts pension plan benefits from the estate, they necessarily must be estate property under § 541(a)(1). The fact that pension interests are in general made subject to exemption from bankruptcy estate property, the Court explained, should not be interpreted to mean that some may not be included in estate property at all. The Fourth Circuit,

adopting the Fifth Circuit's reasoning in *In re Goff*, 706 F.2d 574 (5th Cir.1983), noted:

[w]e believe that whether a particular pension fund interest subject to transfer restrictions is initially included in estate property is wholly determined by whether, per § 541(c)(2), the restriction is enforceable under applicable nonbankruptcy law, including any public policy concerns that might make unenforceable a restriction in a pension plan settled and revocable by a beneficiary. *See e.g., Goff*, 706 F.2d at 588.[19]

*McLean*, 762 F.2d at 1208.

■ The *McLean* court makes clear that if the spendthrift provisions of a pension fund agreement are enforceable under state law, they are enforceable in bankruptcy and a debtor's pre-distribution interest in the pension fund is excluded from estate property by virtue of § 541(c)(2). *See McLean*, 762 F.2d at 1206–07 (noting that if the restriction on transfer in the Central trust agreement is enforceable under Illinois law, which governs the fund, then the restriction is also enforceable in bankruptcy under § 541(c)(2), and the debtor's pre-distribution interest in the fund is excluded from estate property pursuant to § 541(c)(2)). Accordingly, our inquiry, in accordance with *McLean*, is *not* whether the Xerox Plan qualifies as a traditional spendthrift trust, but whether the restrictions on transfer of the debtor's interest in the pension funds held in trust pursuant to the Xerox Plan, are enforceable under the applicable state law. We stress at this juncture that because each of the accounts at issue has different features, we deal with each separately. We address first the Retirement Account feature of the Xerox Plan because it closely resembles the pen-

---

19. The trustee in the case *sub judice* misleadingly cites *McLean* for the proposition that the Fourth Circuit has adopted the *Goff* Court's reasoning that, in considering whether an ERISA plan should be excluded from the bankruptcy estate based upon the anti-alienation language of the plan, any exclusion under the Bankruptcy Code is provided solely by state spendthrift trust law and not by operation of ERISA. *See* Memorandum Of Points And Authorities In Support Of Plaintiff's Motion For Summary Judgment, pp. 10–11. We note, first, that the Fourth Circuit in *McLean* did not consider whether ERISA constitutes applicable nonbankruptcy law under § 541(c)(2). *See McLean*, 762 F.2d 1204, 1206–10. The Fourth Circuit, rather, found that because the transfer restriction in the Central trust agreement was enforceable under Illinois law, then the fund was excluded from the estate under § 541(c)(2). *See id.* at 1206–07. The opinion cites *Goff* solely for the proposition that pension benefits are not automatically estate property under § 541(a)(1) merely because they are expressly subject to exemption under § 522(d)(10)(E). *See id.* at 1208.

sion fund at issue in *McLean*, in that contributions to the Retirement Account are made by Xerox and the funds in such account are not easily reachable by the debtor.[20] Accordingly, because public policy concerns would not prevent enforcement of the transfer restrictions on the funds in the Retirement Account under nonbankruptcy law, *see McLean*, 762 F.2d at 1207, our inquiry will be whether the transfer restrictions on the debtor's interest in the Retirement Account feature of the Xerox Profit Sharing Plan indeed are enforceable under the applicable state law.

Xerox contends that New York law applies by virtue of a provision in the Xerox Profit Sharing Plan which states:

*Section 14.01. New York and Applicable Federal Law Govern.* This Plan shall be construed according to the laws of the State of New York and applicable federal law, and all provisions hereof shall be administered according to the laws of such state and federal law, and all persons accepting or claiming benefits under this Plan shall be deemed to consent to the provisions of such laws.

Xerox also notes that Massachusetts law may apply since the trust instrument underlying the Xerox Profit Sharing Plan provides that the law of Massachusetts, which is the pension trust's situs, governs the

trust. The trust instrument has a provision stating:

*14.2 Governing Law.* This Agreement and its performance shall be governed by and construed in accordance with the applicable laws of the United States (including ERISA) and, to the extent permitted by such laws, with the laws of the Commonwealth of Massachusetts. Any provision of this Agreement in conflict with or in violation of said governing law shall survive to the extent not in conflict with or a violation of that law. In the event of any conflict between the provisions of the Plan and of this Agreement, the latter shall prevail.

*See* § 14.2 of Xerox Corporation Trust Agreement To Fund Retirement Plans. Xerox also claims, however, that we do not have to decide whether New York or Massachusetts law applies because the spendthrift provision in the Xerox Plan is enforceable under the laws of both states. The trustee, who examines Virginia spendthrift trust law without explaining why it should control, claims that if New York or Massachusetts law does apply, the Xerox Plan would not be viewed as a traditional spendthrift trust and therefore would not be excluded from the estate under § 541(c)(2).[21]

---

**20.** *See infra*, note 26 (describing very limited conditions under which debtor can reach funds in Retirement Account).

**21.** As we noted above, our inquiry, in accordance with the Fourth Circuit decision in *McLean* is not whether the Xerox Plan qualifies as a traditional spendthrift trust, but whether the restrictions on transfer of the debtor's interest in the Retirement Account held in trust under the Xerox Plan are enforceable under the applicable state law. We stress that although the *McLean* court appeared to analyze a pension fund trust instrument, the Court stated in dicta that § 541(c)(2) should not be confined in its recognition of enforceable transfer restrictions to those found in traditional spendthrift trusts. *See McLean*, 762 F.2d at 1207 n. 1. Thus, although the Court did not explicitly state that § 541(c)(2) applies to spendthrift provisions in pension and profit sharing plans that are in the nature of a spendthrift trust, such an inference can be drawn from both the Court's dicta, noted above, and its reliance on the case of *Peoples Finance Co. v. Saffold*, 83 Ill.App.3d. 120, 38 Ill.Dec. 534, 403 N.E.2d 765 (1980), which did involve a pension plan that the Illinois court

found to be in the nature of a trust. *See Peoples Finance*, 83 Ill.App.3d. at 123, 38 Ill.Dec. 534, 403 N.E.2d 765. Here, it is significant that the Retirement Account is in critical aspects like the pension fund in *McLean*, in that it is funded by Xerox and not easily reachable by the debtor. *See infra*, note 26 (describing Retirement Account in detail). Thus, public policy concerns, as the *McLean* court noted, would not prevent enforcement of the restrictions on transfer with respect to the Retirement Account if controlling nonbankruptcy law enforces such restrictions. In addition, we address here the trustee's contention that "[w]ith respect to the assertion by defense counsel that Debtor's claim of exemption is governed by New York or Massachusetts law, this Court has already ruled at a previous hearing in this case that exemptions are determined by the law of state where the debtor resides which is Virginia." *See* Supplemental Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment, p. 3. We observe, first, that as a factual matter Xerox claims that the debtor's *exclusion* of her interest in the plan pursuant to § 541(c)(2), and not the debtor's state law *ex-*

At the outset, we observe that the Fourth Circuit has provided guidance for bankruptcy courts faced with the problem of determining which state's law to apply in a situation in which the applicable federal law incorporates matters which are the subject of state law. *See In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 205–06 (4th Cir.1988), *cert. denied*, 487 U.S. 1236, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988). In *Merritt*, the Fourth Circuit dealt with the issue of whether a bankruptcy trustee's interest in proceeds from the sale of a barge was superior to the interests of the barge owner, who chartered the barge to the debtor. The barge owner was a Louisiana corporation with its principal place of business in Louisiana. The debtor, a South Carolina corporation, had its principal place of business in that state.

In considering whether to apply Louisiana or South Carolina law to determine the nature of the debtor's interest in the barge, the *Merritt* Court found that a bankruptcy court should apply the rule set forth by the United States Supreme Court in *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Supreme Court in *Klaxon* held that a federal court sitting in diversity must apply the choice of law rules of the state in which it sits. *See Klaxon*, 313 U.S. at 496, 61 S.Ct. at 1021. The Fourth Circuit explained that the *Klaxon* rule rests on the rationale that a federal court, in determining state law issues which arise in federal court only by the accident of diversity, must apply state law, including the conflict of law rules, to those issues. *Merritt*, 839 F.2d at 205 (citing *Klaxon*, 313 U.S. at 496, 61 S.Ct. at 1021, and *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)).

Noting that the Supreme Court has never specifically applied *Klaxon* to bankruptcy courts, the Fourth Circuit ruled that a federal bankruptcy court seeking to determine the extent of a debtor's property interest should apply the *Klaxon* rule in the absence of a compelling federal interest which dictates otherwise. *Merritt*, 839 F.2d at 206. The Court cited several reasons for applying the *Klaxon* rule to bankruptcy proceedings. First, such a uniform rule would enhance predictability in an area where it is critical. Second, and most important, this rule would be in accord with the model established by *Erie* and *Klaxon*, which both make clear that "except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the state. *Erie*, 304 U.S. at 78 [58 S.Ct. at 822]." *Merritt*, 839 F.2d at 206. The *Merritt* Court, finding no overwhelming federal policy that required them to formulate a choice of law rule as a matter of independent federal judgment, adopted the choice of law rule of the forum state.

The case at bar presents a conflicts of law problem similar to that faced by the Fourth Circuit in *Merritt*. Here, the debtor, Kathy Putman, is domiciled in Virginia. The property right at issue, which is her right to receive funds under the Xerox Profit Sharing Plan, grows out of that document, which by its terms is governed by New York law. The Plan, in turn, establishes a trust agreement between Xerox Corporation and the State Street Bank and Trust Company of Boston, Massachusetts, to hold the funds in trust for Xerox employees. The trust agreement states that it is to be governed by the laws of Massachusetts, which is the situs of the trust.

emptions under § 522, is governed by New York or Massachusetts law. Second, as we noted in the hearing, exemptions are determined by the law of the state in which the debtor is domiciled. *See* 11 U.S.C. § 522(b)(2)(A). Exclusions of an interest in a profit sharing plan from the estate under § 541(c)(2), however, are governed by whatever state law controls the agreements giving rise to the debtor's interest in the funds under the profit sharing plan. *See McLean v. Central States, Southeast & Southwest Areas Pension Fund*, 762 F.2d 1204, 1206–07 (4th Cir.

1985) (applying the state law that governed the pension fund in determining whether debtor's interest in pension fund was excluded from bankruptcy estate pursuant to § 541(c)(2) of the Code); *see also In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 205–06 (4th Cir.1988) (stating that bankruptcy courts facing situations in which the applicable federal law incorporates matters which are the subject of state law, should apply state law, including the forum state's conflict of law rules, to the underlying substantive state law questions).

Thus, Kathy Putman's interest in the funds grows out of agreements which, by their terms, provide that they are governed by the laws of different states; namely, New York and Massachusetts.

Adopting the Fourth Circuit's approach in *Merritt*, we apply Virginia's conflict of law rules to determine which state's law to apply in examining whether Kathy Putman's interest in the funds is excluded from property of the estate pursuant to § 541(c)(2).[22] Because we find that Kathy Putman's interest in, and right to, the funds at issue derive primarily from the Xerox Profit Sharing Plan, and not the underlying trust instrument, which in essence defines the legal relationship between Xerox and the trust company,[23] we look to the Plan in examining whether the debtor's interest in the funds is excluded from the estate.[24] In order to apply Virginia's conflict rules to determine what law governs the Plan, however, we first must characterize the nature of the Retirement Account feature of the Plan.[25]

In characterizing the Retirement Account feature of the Plan, we follow the widely accepted rule that characterization of an action for conflicts of law purposes is to be made in accordance with the law of the forum. *See, e.g., Sokolowski v. Flanzer*, 769 F.2d 975, 978 (4th Cir.1985) ("In determining whether a law is substantive or procedural, the federal district court accepts the characterization placed on the involved rule by the state court."); *Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, 611 (9th Cir.1975) ("the characterization of an action must be made in accordance with the law of the forum."); *Fahs v. Martin*, 224 F.2d 387, 396–97 (5th Cir.1955) ("in deciding how [a] matter should be characterized for conflict of laws purposes, it is clear that the law of the forum should control."); *Willard v. Aetna Casualty & Surety Co.*,

**22.** We are unable here, as was the Fourth Circuit in *Merritt*, to identify any overwhelming federal policy that requires us to formulate a choice of law rule as a matter of independent federal judgment, and accordingly, will apply the choice of law rules of Virginia, the forum state.

**23.** *See e.g.,* Xerox Corporation Trust Agreement To Fund Retirement Plans, § 2.2 ("*Appropriateness of Payment.* The Trustee shall not have any right to or be under any duty to administer the Plan, to interpret or construe it, or to inquire as to whether any payment directed by an Authorized Person is in accordance with the provisions thereof."); Article Four (Additional Powers and Duties of the Trustee); Article Five (Recordkeeping and Reports); Article Seven (Trustee's Fees and Expenses).

**24.** In finding the debtor's interest in the funds to be controlled mainly by the Plan, this Court does recognize that Kathy Putman is a beneficiary under the trust instrument as well. However, because Kathy Putman's right to receive the funds held in trust is governed by the profit sharing plan, *see* Xerox Profit Sharing and Retirement Plan, Article Three (Eligibility For Participation), Article Four (Contributions and Allocations), Article Six (Retirement Accounts, Company Savings Accounts and Employee Savings Accounts), Article Seven (Normal and Deferred Retirement Benefits), Article Eight (Disability Retirement, Early Retirement, Hardship and Other Withdrawals), Article Nine (Termination of Employment By Resignation or Discharge); *see also, supra,* notes 6–10 and accom-

panying text (citing Xerox Plan provisions which dictate circumstances under which an employee can gain access to funds in Xerox Plan accounts), and the Plan itself controls significant aspects of the trust, *see* Xerox Profit Sharing and Retirement Plan § 1.02 (establishing agreements of trust), § 2.01 (providing that Plan Administrator may construe Plan and agreements of trust), § 2.04 (providing for management of trust fund), § 13.02 (providing when Plan and trust shall terminate), it is the Plan that we find to be dispositive of the issue before the Court.

Moreover, even if we were to find the trust agreement to be dispositive and applied Massachusetts law, *see infra,* note 26 (discussing why Massachusetts law would be applicable to trust), the outcome of the § 541(c)(2) analysis would be the same under both Massachusetts and New York law, *see infra,* text at 799–800 (analyzing whether spendthrift provision in Xerox Plan is enforceable under both New York and Massachusetts law.)

**25.** *See generally* 16 Am.Jur.2d *Conflict of Laws* § 3 (1979) (explaining that "[i]n a conflict of laws situation, a court must determine at the outset whether the problem presented to it for solution relates to torts, contracts, property, or some other field, or to a matter of substance or procedure in order to refer to the appropriate law; that is, the court initially must, whether consciously or not, go through the process of determining the nature of the problem, because otherwise it will not know which choice-of-law rule to apply to the case.")

213 Va. 481, 483, 193 S.E.2d 776, 778 (1973) ("The court of the forum state determines according to its own conflict of laws rules whether a question of law is substantive or procedural."); Restatement (Second) of Conflicts of Laws § 124 (1969) (providing that "the local law of the forum determines

such questions as whether ... the action shall be in tort or contract ...").

Although the Virginia Courts have never characterized a contributory profit sharing and retirement plan for conflicts of law purposes, the Virginia Supreme Court has found that a noncontributory profit sharing and retirement plan is in the nature of a contract.[26] In reviewing Virginia conflicts

---

**26.** *See Nicely v. Bank of Virginia Trust Co.,* 221 Va. 1084, 1089, 277 S.E.2d 209, 211–12 (1981) (finding that noncontributory profit sharing plan is in the nature of a unilateral contract); *see also Audio Fidelity Corp. v. Pension Benefit Guaranty Corp.,* 624 F.2d 513, 517 (4th Cir.1980) (noting that ERISA pension benefit plan was a contract between employer that sponsored the plan and its employees. Although the Xerox Plan is a contributory plan, which is funded by both the employer and employees, as opposed to a noncontributory plan which is funded only by the employer, such a difference would not appear to affect the contractual nature of the plan. *See, e.g. Rochester Corp. v. Rochester,* 450 F.2d 118, 120–21 (4th Cir.1971) (noting that rights under a pension plan are contractual and whether the plan is contributory or noncontributory, the benefits earned are not gratuities). In characterizing an instrument for conflicts of law purposes, the Virginia Supreme Court has recognized that an instrument may fall under more than one classification. For example, in undertaking a conflicts of law analysis in *Tait v. Hain,* 181 Va. 402, 412, 25 S.E.2d 321, 324 (1943), the Virginia Supreme Court recognized that an insurance policy, which the court acknowledged was a contract, also might be considered to be a spendthrift trust. *See Tait,* 181 Va. at 412–13, 25 S.E.2d 321. Consequently, the *Tait* court examined conflicts law relating to both contracts and spendthrift trusts to determine which law governed the insurance policy. *Id.* at 410–15, 25 S.E.2d 321. Because the court found, however, that under both the conflicts law relating to contracts and that relating to spendthrift trusts, the same state's law applied, the court was not required to choose one characterization of the insurance policy over the other. *See id.* at 412, 25 S.E.2d 321 (finding that because the parties intended to contract with reference to New York law, such law governed; and further observing that if the agreements were held to create a trust relationship, New York law also governed, because New York was the situs of the trust res) (relying on *Hutchison v. Ross,* 262 N.Y. 381, 187 N.E. 65 (1933)); *see also Hart v. Savings & Profit Sharing Pension Fund of Sears, Roebuck & Co.,* 291 F.Supp. 95, 97 (E.D.Va.1968) (recognizing that a profit sharing pension fund might be characterized as both an inter vivos trust and a third party beneficiary contract).

Here, we are faced with a characterization problem similar to that which faced the *Tait* court. Although the Virginia Supreme Court has characterized noncontributory profit sharing and re-

tirement plans as being in the nature of a contract, we observe that with respect to the Retirement Account feature of the Xerox Plan, the Plan also meets the defining characteristics of a spendthrift trust under Virginia law, as we explain below. If we thus were to characterize the Retirement Account feature of the Plan as a spendthrift trust, we would follow the *Tait* court's lead and apply the rule in *Hutchison v. Ross,* 262 N.Y. 381, 187 N.E. 65 (1933) that the law governing an inter vivos trust in personal property is the law of the state where the property is situated if the parties intended that such law apply. *See Tait,* 181 Va. at 412–14, 25 S.E.2d 321 (citing *Hutchison,* 262 N.Y. at 395, 187 N.E. 65). Under the rule in *Hutchison,* the law of Massachusetts, where the property is situated, would apply. Because the resolution of the issue before the Court is the same under both Massachusetts and New York law, as examined *infra,* text at 799–800, we need not choose one characterization of the Retirement Account feature of the Xerox Plan over the other for conflicts of law purposes.

In recognizing that the Retirement Account feature of the Xerox Plan meets the characteristics of a spendthrift trust under Virginia law, we make such observation only for conflicts of law purposes and do not mean to imply that such recognition is necessary for purposes of a § 541(c)(2) analysis. As we noted earlier, the *McLean* court does not require that a court determine that a pension plan is a traditional spendthrift trust to be excludable from the estate under § 541(c)(2), but merely that the pension funds held in trust pursuant to the Plan are subject to transfer restrictions that are enforceable under the applicable state law. Because we recognize, however, that the trustee in the case at bar, relies mainly on the argument, rejected by *McLean,* that the Xerox Plan is not excluded under § 541(c)(2) because it is not a traditional spendthrift trust under Virginia law, we take this opportunity to address his concerns in conjunction with the conflicts of law issue. At the outset, we note generally that a valid trust must have a competent settlor and trustee, an ascertainable trust res and certain beneficiaries. *See In re Wilson,* 3 B.R. 439 (Bankr.W.D.Va. 1980) (citing 76 Am.Jur.2d "Trusts" § 31). In the case at bar, the settlor, Xerox, has provided in the Xerox Plan for the creation of a trust fund, the trust res, and for trustees to serve under the Xerox Plan. *See* Xerox Profit Sharing and Retirement Plan § 1.02 (agreements of trust), Article IV (describing the funding of the Plan accounts). In addition, Article III of the

Note 26—Continued

Plan outlines who is eligible to participate in, or be a beneficiary of, the Plan.

Turning specifically to spendthrift trusts, we note that Virginia recognizes their validity. *See* Va.Code Ann. § 55–19 (Supp.1989) (providing that "any ... estate, not exceeding $500,000 in actual value, may be held in trust upon condition that the trust corpus and income, or either of them, shall in the case of a simple trust or, in the case of a complex trust, may in the discretion of the fiduciary be paid to or applied by the trustee for the benefit of the beneficiaries without being subject to their liabilities or to alienation by them, but no such trust shall operate to the prejudice of any existing creditor of the creator of such trust."); *see also Alderman v. Virginia Trust Co.,* 181 Va. 497, 512, 25 S.E.2d 333 (1943) (observing that § 5157 of the Virginia Code (now § 55–19 of the Virginia Code) recognizes the validity of spendthrift trusts in Virginia). We point out that, with respect to the $500,000 limitation, Kathy Putman's "estate" pursuant to § 55–19 of the Virginia Code, is far below this limitation. *See supra,* text at 787 (describing amounts in Kathy Putman's Plan accounts).

Under Virginia law, a spendthrift trust has three defining characteristics. It must provide for the support and maintenance of its beneficiary; its settlor expressly or impliedly must intend to protect the trust from the beneficiary's creditors; and the settlor must intend to prevent the beneficiary's voluntary or involuntary alienation of the trust property. *See In re Hersch,* 57 B.R. 667, 668–69 (Bankr.E.D.Va.1986) (citing *In re Wilson,* 3 B.R. 439, 442 (Bankr.W.D.Va.1980); 17 M.J. *Spendthrift Trusts* § 1 (1979); 76 Am. Jur.2d, *Trusts* § 150 (1975)).

We find that the Xerox Plan, with respect to the Retirement Account, has the characteristics of a spendthrift trust. First, several features of the Xerox Plan clearly demonstrate that the Retirement Account is intended to provide for the support and maintenance of the beneficiary, Kathy Putman. For instance, funds in the Retirement Account may be paid only upon Kathy Putman's death, retirement, or separation from Xerox employment, *see supra,* notes 6–8 and accompanying text (listing sections of Xerox Plan describing when Kathy Putman can reach funds in her Retirement Account). Such restrictions on access to the Retirement Funds evidence Xerox's intent that the funds be available at times when Kathy Putman would need the funds for support and maintenance; namely, upon her retirement or separation from Xerox employment. *See* p. 42, Xerox Pamphlet "You and Xerox; Benefits for Salaried Employees" (explaining that the Xerox Retirement Plan is designed to help assure a participant's future financial security by providing monthly income to the participant and his or her spouse for life upon retirement from Xerox). Moreover, despite what the trustee in the case at bar contends, Virginia law does not require that, for a trust to be spendthrift, the beneficiary presently rely on the trust for support and maintenance. *See Alderman v. Virginia Trust Co.,* 181 Va. at

513, 25 S.E.2d 333 (stating that § 5157 (now § 55–19) of the Virginia Code permits a donor to create a spendthrift trust within the statutory limitation *"irrespective of the station in life of the beneficiary or his current needs."*) (emphasis supplied).

With reference to the second and third features of a spendthrift trust, the spendthrift provision in the Xerox Plan expressly intends to protect the trust from the beneficiary's creditors, *see* § 14.04 of Plan (spendthrift provision stating in part that "none of the benefits, payments or proceeds arising out of or by virtue of the Plan, shall be subject to any claim of or any legal process by any creditor of a Participant, retired Participant, or of any beneficiary ...") as well as prevent the beneficiary's voluntary or involuntary alienation of the trust property, *see id.* (providing that "no Participant, retired Participant or beneficiary thereof, shall have any right to anticipate, alienate, encumber or assign any right or benefit arising out of or by virtue of the Plan.")

In addition, we feel compelled to address here the trustee's assertion that the Xerox Plan is not a traditional spendthrift trust because Kathy Putman exercises substantial control over the funds in trust. As a factual matter, we fail to see the legitimacy of the trustee's assertion with respect to the Retirement Account feature of the Plan. First, Kathy Putman did not create the Plan; she does not participate in managing the Xerox Plan, *see* § 2.01 of Plan (providing that Plan Administrator shall administer the Plan in accordance with its terms); she does not have the right to decide what amount she is entitled to under the Plan, *see* § 2.06 of Plan (providing that "[a]ny question as to ... the amount of contribution allocated to a Participant or the determination of a Participant's interest in the assets of the Trust at any time shall be determined by the Plan Administrator in accordance with the terms of the Plan."); she does not have the power to terminate the Plan and trust, *see* § 13.01 of Plan ("The employer reserves the right to revoke or terminate this Plan and the Trust created pursuant thereto, in whole or in part, at any time, or to reduce, suspend or discontinue its contributions hereunder...."); she does not fund the Retirement Account, *see* § 4.01 of Plan (Employer Contributions); and she can gain access to the funds in her Retirement Account only upon death, *see* § 10.02 of Plan, retirement, *see* §§ 7.01, 7.03 of Plan, or termination of employment by resignation or discharge, *see* §§ 9.01, 9.02 of Plan. We have no evidence that Kathy Putman has died, retired, or terminated her employment with Xerox. As a result, she presently cannot gain access to funds in her Retirement Account. We find no merit in the trustee's assertion that Kathy Putman has substantial control over the funds because she can gain access to them merely by quitting her job. *See In re Wiggins,* 60 B.R. 89, 95 (Bankr.N.D. Ohio 1986) ("The ramifications of terminating one's employment are sufficiently self-defeating so as to discourage

law governing contracts, therefore, we observe that Virginia courts have recognized the validity of contract provisions that specify the law that will govern the contract. *See Tait v. Hain*, 181 Va. at 410, 25 S.E.2d 321 (finding that "the true test for the determination of the proper law of a contract is the intent of the parties and that this intent whether express or implied, will always be given effect except under exceptional circumstances evincing a purpose in making the contract to commit a fraud on the law.") (citing 11 Am.Jur. *Conflict of Laws* § 119); *C.I.T. Corp. v. Guy*, 170 Va. 16, 22, 195 S.E. 659, 661 (1938) ("The nature, validity and interpretation of contracts are governed by the law of the

Note 26—Continued

an abuse of the right to receive a payment."). If she were to quit, she likely would need these funds for financial security as the Xerox Plan contemplates. Moreover, in contrast to what the trustee asserts, Kathy Putman could not easily be rehired by Xerox. The Xerox Personnel Manual explains that the rehiring of former employees is discouraged. The Manual provides:

"The rehiring of former employees, while not absolutely prohibited, is discouraged. At a minimum, any proposed rehire must be approved by two levels of management above the hiring manager with concurrence of the responsible personnel representative.

For former employees who have subsequently worked for competitors, consideration for rehire is *strongly* discouraged. Any exceptions should be rare and require written approval by the functional vice president and personnel manager....

Employees approaching age 55 who terminate with the apparent reason of obtaining profit sharing funds in a lump sum to avoid required annuity purchase upon retirement are not eligible for rehire ..." *Xerox Personnel Manual*, p. 4 (Approvals for Hiring and Rehiring).

As a final matter, we observe that the cases cited by the trustee holding that ERISA funds were not excluded from the estate under § 541(c)(2), involved ERISA plans in which the debtor exercised substantial control over the funds in trust. *See e.g., In re Lichstrahl*, 750 F.2d 1488, 1490 (11th Cir.1985) (finding that pension plan in which beneficiary had "absolute dominion" over the funds in trust, was not a spendthrift trust under Florida law and therefore was not excluded from the estate under § 541(c)(2)); *In re Goff*, 706 F.2d 574, 588, 589 (5th Cir.1983) (finding that self-settled Keogh plan which allowed the beneficiary to withdraw plan assets, was not a spendthrift trust that was excluded from the estate under § 541(c)(2); further stating in dicta that "without passing upon the exact limits of [pension] plans which could properly be characterized 'spendthrift trusts,' *the employer-created-and-controlled nature of those plans may well make them analogous to a spendthrift trust.*") (emphasis supplied); *In re Kerr*, 65 B.R. 739, 740, 745 (Bankr.D. Utah 1986) (finding that self-settled Keogh retirement plan was not spendthrift trust and was not excluded from estate under § 541(c)(2)); *In re DiPiazza*, 29 B.R. 916, 922 (Bankr.N.D.Ill.1983) (finding that pension and profit sharing plans which allowed debtor to reach the funds at any time was not a spendthrift trust under Illinois law and was not excluded from the estate under § 541(c)(2)). These cases are distinguishable from the case at bar which involves funds in a Retirement Account controlled mainly by the employer.

Moreover, several cases cited by the trustee for the proposition that § 541(c)(2) excludes only traditional spendthrift trusts from the estate, involved ERISA plans which were found to be in the nature of a spendthrift trust and thus excludable from the estate pursuant to § 541(c)(2). These plans were substantially similar to the Retirement Account feature of the Xerox Plan in that the beneficiaries had virtually no control over the funds in trust. We believe that these cases are entirely consistent with our finding that the Retirement Account under the Xerox Plan is in the nature of a spendthrift trust. *See In re Crenshaw*, 51 B.R. 554, 559–60 (N.D.Ala.1985) (excluding under § 541(c)(2) debtor's interest in pension plan which court found to be a spendthrift trust under Illinois law, on basis that debtor did not participate in managing the plan, debtor did not have any right to decide what he could receive from the plan, and debtor could not withdraw funds before termination or receive vested funds after termination without employer's consent); *In re West*, 64 B.R. 738, 743–44 (Bankr.D. Or.1986) (finding that the spendthrift provisions of profit sharing plan met the requirement of § 541(c)(2) and plan was excluded from the estate on the basis that the debtor was not the settlor of the plan, debtor's interest in the plan was based on employer contributions, and debtor could not withdraw funds before age sixty, unless he became disabled, was terminated, or died), *aff'd.*, 81 B.R. 22 (1987); *In re Matteson*, 58 B.R. 909, 911 (Bankr.D.Colo.1986) (finding that pension plan was a spendthrift trust under Colorado law and was excludable from the estate under § 541(c)(2), where debtor had no dominion over his benefits in the employer-created-and-controlled plan, debtor did not manage the plan, and debtor could withdraw funds from plan only upon death, disability, or termination of plan); *In re Kwaak*, 42 B.R. 599, 602 (Bankr. D.Me.1984) (finding that profit sharing retirement trust was analogous to spendthrift trust under Maine law and therefore excluded from estate under § 541(c)(2), where beneficiary could not withdraw funds, deposit funds, borrow against his interest, or manage deposits in any way).

place where made, unless the contrary appears to be the express intention of the parties."); *see also Thornhill v. Donnkenny, Inc.,* 823 F.2d 782, 787 (4th Cir.1987) (noting that "Virginia conflicts of law rules generally honor contractual choice of law provisions."); *Bryant Elec. Co., Inc. v. City of Fredericksburg,* 762 F.2d 1192, 1196 n. 8 (4th Cir.1985) (stating that Virginia courts have held that contracting parties may, by agreement, choose what law will govern their contract) (citations omitted). In following the Virginia court's characterization of the Retirement Account feature of the Xerox Plan as a contract, therefore, we look to Virginia conflicts law which honors contractual choice of law provisions, and apply the law specified in the Xerox Profit Sharing Plan, which is the law of New York where Xerox is incorporated.[27]

Accordingly, we now must determine, in accordance with the Fourth Circuit opinion in *McLean,* whether the restrictions on transfer of Kathy Putman's interest in the Retirement Account feature of the Xerox Profit Sharing Plan are enforceable under New York law. To aid in our examination of New York law, however, it would be helpful to review the cases relied upon by the *McLean* Court in its determination of whether restrictions on transfer of the debtor's interest in a pension fund were enforceable under the law of the state governing the pension fund.

As noted above, in finding the transfer restrictions in the pension fund enforceable under Illinois law, the *McLean* Court first observed that "Illinois courts have long

recognized the enforceability of spendthrift trusts, holding that their protection might run to both income and corpus." *See McLean,* 762 F.2d at 1207 (citing *Von Kesler v. Scully,* 267 Ill.App. 495, 505 (1932)). The Fourth Circuit then noted that Illinois courts more recently have recognized that "the spendthrift provisions of ERISA-qualified funds may be enforceable under Illinois spendthrift trust law." *See McLean,* 762 F.2d at 1207. One case cited by the Court in *McLean* in support of this proposition is *Peoples Finance Co. v. Saffold,* 83 Ill.App.3d 120, 38 Ill.Dec. 534, 403 N.E.2d 765 (1980), in which the Appellate Court of Illinois considered whether the ERISA pension benefits of a judgment debtor were subject to wage deduction proceedings by the creditor. The Illinois court found that the provision in the pension fund agreement providing that benefits arising under the plan could not be assigned and that a beneficiary's interest would not be liable for debts of the beneficiary, was valid and enforceable against the judgment creditor under Illinois law. *Peoples Finance,* 83 Ill.App.3d at 122–23, 38 Ill.Dec. 534, 403 N.E.2d 765. In finding the provision enforceable under Illinois law, the Illinois court stated, "[t]he pension plan created a fund in the nature of a trust for the benefit of the defendant ..., and we find that the benefits due him under the Plan were not subject to wage deduction or garnishment proceedings." *Id.* at 123, 38 Ill.Dec. 534, 403 N.E.2d 765 (citations omitted).

Similarly, the Fourth Circuit relies upon *Christ Hospital v. Greenwald,* 82 Ill.

---

**27.** In honoring the choice of law provision in the Xerox Profit Sharing Plan, we are not unmindful of the fact that the Plan could be labeled an adhesion contract, which is a contract drafted by a dominant party and presented to a weaker party, who has no real opportunity to bargain over the terms. *See Lomanto v. Bank of America Nat'l Trust & Sav. Ass'n.,* 22 Cal. App.3d 663, 668 99 Cal.Rptr. 442, 444 (1972) (defining adhesion contract). Assuming *arguendo* that the Plan is an adhesion contract, however, courts still have honored choice of law provisions in such contracts. *See Burbank v. Ford Motor Co.,* 703 F.2d 865, 867 (5th Cir.1983) (fact that choice of law clause was part of adhesion contract was not reason, standing alone, to set clause aside); *Davis v. Humble Oil & Refin-*

*ing Corp.,* 283 So.2d 783, 794 (La.App.1973) (on rehearing, honoring choice of law clause in pension plan on ground that where employees are scattered throughout various states, it was important that plan be construed uniformly); *see also* Restatement (Second) of Conflicts § 187 comment b (Supp.1988) ("Choice of law provisions contained in [adhesion] contracts are usually respected. Nevertheless, the forum will scrutinize such contracts with care and will refuse to apply any choice of law provision they may contain if to do so would result in substantial injustice to the adherent.") Because we find that no substantial injustice would result to Kathy Putman by applying New York law, we will give effect to the choice of law provision in the Plan.

App.3d 1024, 38 Ill.Dec. 469, 403 N.E.2d 700 (1980), in which the Appellate Court of Illinois considered whether a spendthrift provision in an ERISA qualified trust fund prohibited garnishment by a third party creditor under Illinois law. The Illinois court in that case held, *inter alia,* that the spendthrift clause in the trust agreement was valid under Illinois law and concluded that Illinois law prohibited garnishment of the pension funds by a third party nonfamilial creditor. *Christ Hospital,* 82 Ill. App.3d at 1025, 1028, 38 Ill.Dec. 469, 403 N.E.2d 700.

Upon review of these cases cited by the Fourth Circuit in *McLean,* we reiterate for purposes of clarity, what the court did, and did not hold. First, the *McLean* Court found that because the anti-assignment provision in the pension trust fund was indistinguishable in critical respects from spendthrift provisions held enforceable by the Illinois courts, the restrictions were enforceable in bankruptcy. *See McLean,* 762 F.2d at 1206–07. Second, despite what the trustee in the case at bar contends, the

Court did not find that § 541(c)(2) protects only traditional spendthrift trusts.[28] Accordingly, in our examination of New York law, we will look to whether New York courts have enforced spendthrift provisions similar to the one found in the Xerox Profit Sharing Plan. If they have, we must give effect to that restriction in bankruptcy.

■ An examination of the case law of New York reveals that New York courts have enforced spendthrift provisions similar to the one in the Xerox Plan. *See, e.g., Helmsley–Spear, Inc., v. Winter,* 74 A.D.2d 195, 426 N.Y.S.2d 778 (1980), *aff'd,* 52 N.Y.2d 984, 438 N.Y.S.2d 79, 419 N.E.2d 1078 (1981).[29] In addition, we take note of, but do not base our decision on, the New York legislature's recent enactment of Chapter 280 of the 1989 laws. Chapter 280 amends the New York Civil Practice Law and Rules, the Estates, Powers and Trusts law, and the Debtor and Creditor law to provide that all interests established as part of a plan that is qualified under § 401 of the Internal Revenue Code ("ERISA

**28.** *See McLean,* 762 F.2d at 1207 n. 1 (stating in dicta that "[w]e decline to accept the trustee's contention that § 541(c)(2) should be confined in its recognition of enforceable transfer restrictions to those found in 'traditional' spendthrift trusts.").

The trustee, relying on the Second Circuit case of *Regan v. Ross,* 691 F.2d 81 (2d Cir.1982), maintains that under the law of New York, the Xerox Plan would not be considered a traditional spendthrift trust. First, it is so conclusive as to be beyond question that, in interpreting provisions of the Bankruptcy Code such as § 541(c)(2), this Court is bound by the Fourth Circuit, which has stated in dicta that § 541(c)(2) should not be confined in its recognition of enforceable transfer restrictions to those found in 'traditional' spendthrift trusts. *See McLean,* 762 F.2d at 1207 n. 1 (citing *Regan v. Ross,* 691 F.2d 81, 85–86, as standing in contra to *McLean's* proposition).

Second, *assuming arguendo* that we were bound by the *Regan* court's finding that § 541(c)(2) applies only to traditional spendthrift trusts and a pension fund is not a traditional spendthrift trust, we take notice of the New York Legislature's recent enactment of a law providing that all interests established as part of an ERISA plan are conclusively presumed to be spendthrift trusts, for all purposes, including bankruptcy. *See* 1989 N.Y. Laws 280.

Finally, the *Regan* case is distinguishable from the case at bar. The *Regan* court, in holding that pension funds were not spendthrift in form

and therefore not excluded from the bankruptcy estate pursuant to § 541(c)(2), based its holding in large part on the fact that a contrary finding would deny pensioners an opportunity to fund their Chapter 13 plan with pension funds. *See Regan,* 691 F.2d at 85 ("any doubt regarding the scope of the § 541(c)(2) exception or its applicability in Chapter 13 cases must be resolved in a manner consonant with both legislative history and explicit statutory language directing that all forms of income—and pension income specifically—may be used in a Chapter 13 repayment plan.") Such a concern is not at issue in Kathy Putman's case, which is a Chapter 7.

**29.** *Compare Helmsley–Spear,* 426 N.Y.S.2d at 780 (spendthrift provision) *with* § 14.04 Xerox Plan (spendthrift provision). In *Helmsley–Spear,* which was affirmed by the highest court of the state of New York, an employee's interest in an ERISA profit sharing plan and trust was found to be exempt from attachment by the employer by virtue, *inter alia,* of the spendthrift provision in the trust. *See Helmsley–Spear,* 426 N.Y.S.2d at 780. In addition, the court found that the funds were exempt from attachment by virtue of § 1056(d) of ERISA which provides that benefits under an ERISA plan shall not be assigned or alienated, and by virtue of § 5205(d) of the New York Civil Practice Law and Rules, which exempts from application to the satisfaction of a money judgment 90% of the income on payments from a trust. *Id.*

qualified"), are conclusively presumed to be spendthrift trusts, for all purposes, including bankruptcy.[30] This recent enactment, along with § 5205(c) of the Civil Practice Law and Rules, which provides that "... all property while held in trust for a judgment debtor, where the trust has been created by, or the fund so held in trust has proceeded from, a person other than the judgment debtor, is exempt from application to the satisfaction of a money judgment," appears to codify the existing case law and make clear that restrictions on transfer of a debtor's interest in a pension fund are enforceable under New York law.[31]

Accordingly, because the spendthrift provision in the Xerox Profit Sharing Plan is enforceable under New York law, the provision is enforceable in bankruptcy under

§ 541(c)(2) of the Code and Kathy Putman's pre-distribution interest in the Retirement Account is excluded from the estate. If the debtor, however, becomes entitled to any funds from the Retirement Account as the result of death, retirement, or termination of employment with Xerox during the pendency of this case, such funds are to be paid over to the trustee forthwith.

■ With respect to Kathy Putman's interest in the After–Tax Savings Account, we make several observations. First, throughout this opinion, we have cited the Fourth Circuit's admonition that § 541(c)(2) should not be confined in its recognition of enforceable transfer restrictions to those found in "traditional" spend-thrift trusts. Because we found, however, that the Retirement Account was in essence like the

---

**30.** To address a potential criticism that we incongruously are recognizing both Virginia law, which characterizes profit sharing plans as contracts, and New York law, which characterizes ERISA plan interests as spendthrift trusts, we make several observations. First, we do not base our holding on the New York statute, but take notice of it because we believe that it is a codification of New York case law, which protects pension benefits from attachment by creditors. Second, even if we did base our holding on the New York statute, we do not find such to be in conflict with Virginia law since the Retirement Account feature of the Xerox Plan also qualifies as a spendthrift trust under Virginia law. *See supra*, note 26. Accordingly, as a matter of comity, recognition of the New York statute would not offend any public policy of Virginia.

**31.** Under Massachusetts law, we find that the result would be substantially the same as under New York law. Although Massachusetts courts have not dealt directly with the issue of whether a spendthrift provision in a pension plan is enforceable, Massachusetts courts, like the Illinois courts examined by the Fourth Circuit in *McLean*, have enforced spendthrift provisions similar to those in the Xerox Plan. *See Broadway Nat'l Bank v. Adams*, 133 Mass. 170 (1882) (finding that "any ... person, having the entire right to dispose of his property, may settle it in trust in favor of a beneficiary, and may provide that it shall not be alienated by him by anticipation, and shall not be subject to be seized by his creditors in advance of its payment to him."); *see also King v. United States*, 84 F.2d 156 (1st Cir.1936) (interpreting provision in will establishing trust which provided that "[p]ayments of income hereunder are to be made upon the sole order or receipt of the beneficiary without pow-

er of anticipation by voluntary or involuntary assignment or otherwise and free from the control of any creditors" and finding that under Massachusetts law income accruing under trust with such provision was made incapable of transfer in anticipation of its accrual by an assignment of the beneficiary) (relying in part on *Eaton v. Boston v. Safe Deposit & Trust Co.*, 240 U.S. 427, 36 S.Ct. 391, 60 L.Ed. 723 (1916) in which the United States Supreme Court found that a fund bequeathed in trust that was to be paid to the beneficiary for life "free from the interference or control of her creditors" did not pass to the beneficiary's trustee in bankruptcy where Massachusetts law treats such restrictions against interference as limiting the character of the equitable property and inherent in it.).

We observe that although Massachusetts courts have not dealt with the issue of whether a spendthrift provision in a pension plan is enforceable, the Massachusetts Legislature has evidenced an intent to protect pension funds from the reach of creditors. *See* Mass. Gen. Laws Ann. ch. 32, § 41 (West 1989) (providing in part that "[t]he right of an employee to an annuity, pension or endowment, and all his rights in the funds of the association, shall be exempt from taxation and from the operation of any law relating to bankruptcy or insolvency, and shall not be attached or taken on execution or other process to satisfy any debt or liability of the employer or any member of the association."). The legislative intent to protect pension funds from attachment, combined with the Massachusetts courts' willingness to enforce spendthrift provisions, make clear that the spendthrift provision in the Xerox Plan restricting the transfer of the debtor's interest in the Retirement Account, would be enforceable under Massachusetts law.

pension fund at issue in *McLean*, we did not address whether the Fourth Circuit's dicta contemplated that any and all types of trusts, even a savings account type trust, fell within the ambit of § 541(c)(2). However, applying that dicta to decide the outcome of the funds in the other two accounts, we find that the Fourth Circuit's dicta was not meant to be interpreted so broadly to exclude from the estate under § 541(c)(2), funds held in trust in a savings type account. In reaching this conclusion, we refer to the *McLean* Court's observation that giving effect to the transfer restriction in the pension fund agreement would not offend public policy because contributions to the pension fund were made only by the employer and the debtor did not have the power to revoke the trust and reach its corpus. Unlike the Retirement Account, the After–Tax Savings Account gives the debtor virtually unlimited access to such funds, restricted only by the limitation that the debtor has to wait three months between making each withdrawal.[32] Moreover, the debtor has contributed funds to the After–Tax–Savings Account. Consequently, we find that it would not be proper to so broadly construe *McLean's* dicta to exclude from the estate under § 541(c)(2) the After–Tax Savings Account, which is funded by the debtor and easily reachable by the debtor, and thereby offend the public policy considerations that concerned the *McLean* Court. Accordingly, for the reasons stated above and because the After–Tax Savings Account is not exempt under Virginia law,[33] we order the debtor to turn over to the trustee all of the funds in the After–Tax Savings Account that the debtor contributed to such account.[34]

■ Because the Company Savings Account has characteristics of both the Retirement Account and the After–Tax Savings Account, we deal with it last. Significantly, the Company Savings Account resembles the Retirement Account in that both are funded by Xerox. With respect to the debtor's ability to reach the corpus of the funds in the Company Savings Account, such ability is less restricted than access to the Retirement Account and more restricted than access to the After–Tax Savings Account. Specifically, the debtor can withdraw funds from the Company Savings Account upon retirement, death, termination from Xerox employment or upon Xerox's granting, in its sole discretion, of a hardship withdrawal upon the debtor's application. We also observe that pursuant to § 6.03 of the Xerox Profit Sharing Retirement and Savings Plan, the debtor can make a yearly election to take in cash or Xerox stock, the amount of the contribution made by Xerox to the Company Savings Account.[35] If the debtor does not elect to take the funds in cash or stock, such funds are invested in a fund known as the "General Fund." [36]

The question facing this Court is whether the above features of the Company Savings Account make it sufficiently similar to the pension fund at issue in *McLean*, such that enforcing the restrictions on transfer of such account would not offend the public

---

**32.** *See supra* note 10 and accompanying text (describing After–Tax Savings Account as being one in which employee can gain access to funds in account, provided that he has not made a withdrawal from the account within the previous three months).

**33.** Virginia has "opted out" of the federal exemption scheme in § 522 of the Bankruptcy Code, and as a result, the debtor can claim as exempt only that property enumerated in Virginia state statutes. *See* Va.Code Ann. §§ 34–1 to 34–33 (1984).

**34.** This would not include the appreciation portion (the interest) on the After–Tax Savings Account, which was not contributed by the debtor.

**35.** *See* § 6.03 of Plan (Election with Respect to Company Savings Accounts).
Section 6.03 of the Plan provides in part:

"Each Participant and each employee who becomes a Participant during a calendar year for which a contribution is made by the Employer pursuant to Article Four may elect that the funds allocable to his Company Savings Account from such contribution be used to provide benefits in one or more of the following ways: ... (b) distributed to him in cash after deduction of all legally required withholding taxes. OR (c) invested by the Employer, on behalf of such Participant, in Xerox Stock after all legally required withholding taxes have been deducted, and the stock so purchased distributed to the Participant...."

**36.** *See* § 6.04 (Allocation of Amounts Allocable to Company Savings Accounts to Separate Funds).

policy concerns of *McLean* in that the debtor not contribute funds to such an account and the debtor not be able to reach the corpus of such fund. We find that, except for the yearly election feature of the Company Savings Account, it is in critical respects more analogous to the pension account in *McLean* than the After–Tax Savings Account. We base this conclusion on the fact that the debtor did not contribute funds to this account, and does not have the unfettered ability to reach the corpus of these funds.[37] We note, but reject, the trustee's contention that the debtor has "control" over the funds in the Company Savings Account because she can apply for a hardship withdrawal. This contention would be true only if mere application for the hardship withdrawal would automatically result in her receiving such funds. Although it is within the debtor's control to apply for such funds, it is in Xerox's sole discretion whether to grant the request for a hardship withdrawal.[38] Accordingly, we find that because the debtor lacks sufficient ability to reach the funds in the Company Savings Account, which is funded by Xerox, public policy concerns would not prevent enforcement of the transfer restrictions on the debtor's interest in such account. Thus, because such restrictions on transfer of the debtor's interest in the Company Savings Account are enforceable under the applicable law of New York, as noted earlier, the debtor's pre-distribution interest in all funds which the debtor cannot elect to take in cash, are excluded from the estate under § 541(c)(2). With respect to the funds which the debtor can elect to take in cash pursuant to § 6.03 of the Xerox Profit Sharing Plan, if this case is still pending when the debtor is entitled to make her yearly election, we direct the debtor to make such election and turn over such funds to the trustee. We further note, as we did in reference to the Retirement Account, that if the debtor becomes entitled to any funds in the Company Savings Account as the result of death, retirement, termination of employment with Xerox, or the granting of a hardship withdrawal, during the pendency of this case, such funds are to be paid over to the trustee forthwith.

An appropriate order shall enter.

---

37. This Court does realize that the debtor is entitled to borrow funds from the Company Savings Account. We also observe, however, that Xerox has retained the authority to "adopt uniform rules of general application with respect to, among other thing, [sic] amounts which a Participant is entitled to borrow under this section, repayment schedule, application procedures to be followed (including any fees payable), the number of outstanding loans, and default provisions (including the right to suspend a defaulting Participant's eligibility to participate in the Plan for at least twenty-four months)." *See* § 6.15 of Amendment No. 1 to 1985 Restatement of Xerox Corporation Profit Sharing Retirement and Savings Plan. Because Xerox has retained authority to control the loan process, we believe that this supports our observation that the debtor does not have the unfettered ability to reach the funds in the Company Savings Account.

38. The trustee claims that the debtor is eligible for a hardship withdrawal by virtue of the fact that she has filed for relief under Chapter 7 of the Bankruptcy Code. While that may be true, the point is that Xerox, and not this Court, which does not have the authority to rewrite the terms of the Xerox Profit Sharing Plan, has the sole authority to make that determination.